UNITED STATES of America, Plaintiff,

v.

Roy Tibbals WILSON et al., Defendants.

OMAHA INDIAN TRIBE, organized Indian Tribe pursuant to Act of June 18, 1934 (48 Stat. 984) as amended, Plaintiff,

v.

Harold JACKSON and Otis Peterson and the District Court of Iowa in and for Monona County, Defendants.

OMAHA INDIAN TRIBE, etc., Plaintiffs,

v.

AGRICULTURAL INDUSTRIAL INVESTMENT COMPANY et al., Defendants.

Nos. C 75–4024, C 75–4026 and C 75–4067.

United States District Court, N. D. Iowa, W. D.

May 4, 1977.

See also, 433 F.Supp. 57.

**68**

William H. Veeder, Washington, D. C., Donald E. O'Brien, Sioux City, Iowa, James J. Clear, Dept. of Justice, Washington, D. C., for plaintiffs.

Thomas R. Burke and Lyman L. Larsen, Omaha, Neb., Peter J. Peters, Council Bluffs, Iowa, Lowell C. Kindig and Maurice B. Nieland, Sioux City, Iowa, Edson Smith, Omaha, Neb., Jack W. Peters, Council Bluffs, Iowa, Bennett Cullison, Jr., Harlan, Iowa, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BOGUE, District Judge.

The above-entitled actions, consolidated for purposes of trial, as to title to lands within the Barrett Survey Area of the area known as Blackbird Bend, came on for trial in the United States District Court at Sioux City, Iowa, on the 1st day of November, 1976. From the evidence submitted by the respective parties, and upon the entire record, the Court now makes the following:

### FINDINGS OF FACT

#### I.

*Nature of the Action and the Parties*

1. These consolidated actions are lawsuits commenced by the United States of America and the Omaha Indian Tribe seeking injunctive relief and a judgment quieting title to land situated in the State of Iowa, Monona County, east of and adjacent to the Missouri River. The defendants are various entities, and individuals, who also claim title to the land in dispute and seek to quiet title in their names. The basic issue, as tried to this Court, involves how the river moved over the span of a century from the mid–1800s to about the mid-1900s, and whether the land herein involved was added to Iowa riparian land by accretion or, whether the river moved by avulsion leaving the original identifiable land in place.

2. United States of America, plaintiff in Civil No. C75–4024, derives its interest in this litigation as a Trustee for the Omaha Indian Tribe and their reservation lands reserved to the Tribe pursuant to the Treaty of 1854.

3. The Omaha Indian Tribe, plaintiff in Civil Nos. C75–4026 and C75–4067, is a duly organized body corporate, established pursuant to its Constitution and Bylaws having been approved by the Secretary of the Interior as provided by law. Pursuant to its Treaty dated the 16th day of March, 1854 (10 Stat. 1043) with the United States of America, there was established the Omaha Indian Reservation in the then territory of Nebraska.

4. In 1867 the said reservation boundary was surveyed for the General Land Office of the United States Government by T. H. Barrett, Surveyor. Barrett meandered the Nebraska, or right bank of the Missouri River where it adjoins the Omaha Indian

Reservation in the course of conducting his survey. The Reservation boundary, as originally established, was the thalweg of the Missouri River. Thus the Barrett Survey lines were not actually the boundary of the Omaha Reservation where it adjoins the River. *See Hardin v. Jordan,* 140 U.S. 371, 11 S.Ct. 808, 35 L.Ed. 428 (1891). The said 1867 General Land Office Survey shows that Blackbird Bend of the Missouri River flowing east, south and west on the north, east and south sides of a meander lobe or peninsula sticking out like a thumb pointing east from Nebraska into Iowa. The area east of the Iowa-Nebraska 1943 Compact Lines bounded by the said Barrett meander line will be referred to herein as the Barrett Survey. The area including the Barrett Survey Peninsula but extending to the Iowa high bank, north, east and south of the Barrett Survey, will sometimes be referred to as the Blackbird Bend area. These findings and conclusions pertain only to the Barrett Survey Area.

5. Of the numerous defendants in all three lawsuits, the only defendants involved in this trial are those claiming an interest in the approximately 2900 acres within the 1867 Barrett Survey. These defendants are Roy Tibbals Wilson, landowner, RGP Inc., landowner, Otis Peterson, tenant of RGP Inc., Harold Sorenson, landowner, State of Iowa, landowner, and Travelers Insurance Company, mortgagee of RGP Inc. The 1867 Barrett Survey and the location of the defendants' land within that boundary, are set forth in Exhibit T 78.

6. The Tribe's pleadings acknowledge that these landowner defendants, or their predecessors in title, have had possession of the disputed real estate for at least 40 years.[1] During this period of time, a substantial portion of the land was cleared of trees, leveled, fenced, drained, roads built, and cultivated. It is now a valuable and productive tract of farm ground, as evidenced by the purchase of 2180 acres by defendant Wilson in 1972 by Warranty Deed for a consideration valued at $1,685,-000, approximately 1780 acres of which is within the Barrett Survey and the subject of this trial.

7. On April 2, 1975 the Omaha Indian Tribe seized possession of the land within the Barrett Survey before institution of this litigation, and up until June 5, 1975 maintained said possession without the approval or consent of any of the defendants herein. On June 5, 1975, Judge McManus granted a preliminary injunction to the Tribe and Government permitting the plaintiff Tribe to continue its occupancy of the land within the Barrett Survey during the pendency of this action and subject to certain accounting requirements pertaining to the crops. Numerous issues and problems relative to this temporary occupancy, the crops, and access rights developed but are not dealt with directly herein and many are hereby rendered moot.

## II.

### Subject Matter of This Trial

8. By the Order of Judge McManus dated April 5, 1976, a portion of the issues and land involved in all three lawsuits was consolidated for this trial. Approximately 8000 acres of land claimed by the Omaha Indian Tribe in C75–4067 and all issues of damages were severed. The severance of the Barrett Survey Area from the other claims of the Omaha Indian Tribe was necessary because the Barrett Survey line is the only clearly ascertainable line of demarkation, and was the boundary of the area of which the Tribe received possession by virtue of a preliminary injunction entered June 5, 1975. Thus as to the Barrett Survey Area the action was construed as an equitable quiet title action, and the demands of various defendants for a jury trial were denied as to that area. As to lands claimed by the Tribe outside the Barrett Survey Area, the action was treated as a legal action for ejectment, in which defendant's demands for a jury trial may be sustainable. This left the 2900 acres within the Barrett Survey as the subject matter of this trial since the dispute over that land is common to all three lawsuits.

1. See paragraphs 30 and 31 of Tribe's Complaint in Civ. C75–4067.

9. By the Treaty of March 16, 1854, the Omaha Tribe of Indians ceded to the United States all their lands west of the Missouri River, except for certain lands reserved to the Tribe. Pursuant to this Treaty, the Tribe selected a tract of land known as Blackbird Hills to be the Omaha Indian Reservation, which includes the present day Omaha and Winnebago Reservations. The Reservation was thereby established in May of 1855. The thalweg of the Missouri River was constituted the common boundary between the Omaha Indian Reservation and the State of Iowa.

## III.

### Claims of the Parties and the Issues

10. The Government in C75–4024 alleges that it holds title in trust for the Omaha Indian Tribe to all those lands now lying within the Barrett Survey, approximately 2900 acres, and extending to the center of the main channel of the Missouri River as it existed when the Reservation was created. From this 2900 acres, however, the Government's Complaint excepts any claim for certain lands allotted to individual members of the Tribe and sold to non-members amounting to approximately 400 acres.[2] The Government seeks a preliminary injunction maintaining the Omaha Tribe and its members in possession of these lands until the case is decided; a judgment quieting title in the United States as Trustee for the Tribe; and, a permanent injunction against the prosecution of state actions by the defendants relating to these lands.

11. The Government's theory is that the land within the Barrett Survey in 1867 was cut off from the rest of the Reservation through avulsions caused by floods on the Missouri River; the avulsive changes which cut through the ox bow bend began shortly after the Barrett Survey in 1867 and occurred at numerous times thereafter up until the 1940s when the river was stabilized;

and, that each such major move to the west was a sudden shift, which constituted an avulsive change as distinguished from the slow eating away of the banks through erosion.[3]

12. The Tribe in C75–4026 alleges that it is in peaceful possession of the land within the Barrett Survey; that the United States holds the subject lands in trust for them under the Treaty of 1854; and seeks a stay of certain state district court orders pertaining to the occupancy of the land and a preliminary and permanent injunction maintaining the Tribe in possession. In C75–4067, the Tribe filed suit against numerous defendants claiming title to the entire Blackbird Bend area, some 6000 acres of land, and also claiming two bends in the river to the north containing approximately 5000 additional acres. The Tribe alleges that it holds title to the subject land pursuant to the Treaty of 1854; that the adverse claims of the defendants, who have illegally and wilfully trespassed upon the land for approximately 40 years thereby prevented the Tribe's occupancy, are null and void; and seek essentially a judgment quieting title to all the land in the Tribe, the restoration of possession to it, and damages for $50,000,000 for illegal trespasses.

13. The Tribe's theory is that between the time the Treaty was signed in 1854 and 1867, when Barrett made his survey, the river moved eastward by erosion and added to the size of the meander lobe by accretion. After 1867, the Tribe contends this migration, eastward continued until 1875 when the easterly high bank, which is apparent on the land today, was created representing the farthest eastward progression of the river in the Blackbird Bend area. Then, the Tribe further claims that sometime between 1875 and 1879, the river suddenly and perceptibly by avulsion, departed the

---

2. See Government's Answers to Interrogatories Nos. 1 and 2, executed on March 8, 1976. It should be noted, however, that the Tribe's Complaints do not so except these 400 acres from their claims.

3. See Government's Answers to Interrogatories, Nos. 4, 5 and 11, executed on March 8, 1976.

main channel of 1875 to the 1879 channel to the west permanently severing a substantial acreage of the Reservation from the right or west bank of the Missouri River including a portion of the land within the Barrett Survey, and thereafter the Missouri River flowed within the boundaries of the Reservation. After the claimed avulsion between 1875 and 1879 the Tribe contends the river moved north from the 1867 Barrett Survey line eroding as it proceeded and increasing the size of the Reservation by accretion just as the river did in its easterly movement. The Tribe next asserts between 1908 and 1912, the river reached the northerly high bank, which is also visible on the land today, and sometime thereafter departed by avulsive movement to the south like the claimed avulsion from the easterly high bank. The Tribe, therefore, concludes that these avulsions left Omaha Indian Reservation land in place.[4]

14. The defendants in their Answers deny that the lands involved in these suits are a part of the Omaha Indian Reservation but claim title and the right to possession is theirs and seek a judgment quieting title in their names, along with other injunctive relief, by way of counterclaim. Affirmative defenses are also raised in their Answers based upon the statute of limitations, adverse possession, laches, estoppel, abandonment and acquiescence, and general equitable considerations. The Tribe, however, sought and obtained a summary judgment by Judge McManus on these affirmative defenses before trial and while the defendants still assert their applicability they are, therefore, not in issue at this stage of the proceedings.

15. Defendants' theory is that the land within the Barrett Survey was washed down the river and replaced by new land which accreted to the east or Iowa bank. They contend that the eastern approximate-

ly one-half of the Barrett Survey peninsula was a low sandy point in 1867 subject to frequent inundation and easily erodable.[5] After 1852, the meander loop of the River moved eastward until, sometime prior to 1875, it reached its limiting width, and its easternmost position in the locality here in issue. Thereafter, the meander loop commenced a gradual migration to the west and south until, by 1879, it had eroded away almost all of the "low sandy point," and had commenced a process of accretion to the eastern and northern Iowa bank in the areas it had occupied sometime prior to 1875. Accretions were gradually added to the left or Iowa bank of the river and by 1890 a stable land mass had been created and added to the Iowa riparian land. In 1890, the river in the Blackbird Bend area was relatively straight, but the river again started to work itself into a meander bend to the north, which bend then began to migrate downstream in the classic manner through the Blackbird Bend area and the land then situated within the Barrett Survey, until by 1927 the bend had migrated entirely through the area formerly occupied by the 1867 peninsula washing away all the land in its way on the Nebraska or right bank and depositing new land on the Iowa or left bank. Between 1927 to 1943 the river moved westerly to the Iowa-Nebraska 1943 compact line completing the accretions to the Iowa bank which form the subject matter of this lawsuit.

16. The question before this Court for resolution is, therefore, how the river moved between the middle 1800s to the middle 1900s, and specifically whether the land now within the Barrett Survey line was formed as the result of accretions to Iowa riparian land or, alternative, whether it is Omaha Indian Reservation land presently identifiable as being left in place by an avulsion or avulsions.

4. See Tribe's Proposed Findings of Fact and Conclusions of Law executed October 24, 1976.

5. See Barrett Survey Field Notes, Exhibits T 26(d) and (3).

IV.

*Discussion of Evidence\* and Resulting Findings of Fact on the Merits*

To aid in the task of making Findings of Fact, the Court makes the following discussion of the evidence:

## A. INTRODUCTION

It is appropriate at this point to identify the nature of the river with which this case deals. During the period from 1854 until at least the early 1940s the Missouri River can best be described as in a wild and uncontrolled state. As described by Major C. R. Suter in APPENDIX S, of the annual report of the chief of engineers for 1881 (Exhibit T65; W–XX) on page 1650:

"  .  .  .  Its most salient and striking features are the remarkable impetuosity of its current, and its slope, which is considerable for so large a stream. The rapidity of the current and the general instability of the banks and bed give rise to the excessive turbidity of its waters, which have earned for it the title of the 'Big Muddy.'"

And on page 1651:

"  .  .  . .The April rise is generally the most destructive, for it shows, for a time at least, a tendency to follow the channels developed during the low water season preceding, and, as a consequence, the banks are attacked with extreme violence. When the June rise comes the bed is, in a measure shaped for its reception by the preceding flood, and the water passes off with somewhat less destructive results. Both, however, have sufficient power to produce tremendous effects and bring about the most astonishing changes."

And finally on page 1652:

"  .  .  .  Bank erosion to the extent of 2,000 feet per annum, over long distances, has been noted, and to a greater or less extent it is constantly going on, even during low stages. The enormous amount of material thus precipitated into the river, together with that scoured from the bed, causes the formation of innumerable bars, which, even at high water, obstruct navigation. These bars are constantly in motion, their position and shape changing from day to day. The channels through them are also changing both in depth and location, rendering navigation correspondingly uncertain. Owing to the incessant bank erosion the river is steadily increasing the width between high banks, as the bars which are formed opposite caving shores take time to build up to the general level and are meanwhile liable to be themselves attacked and swept away. The erosion *which usually occurs on the upper sides of points* causes these points to move bodily downstream. Where the erosion is more rapid than the bar growth below, the point disappears and the river's course is detrimentally straightened .  .  ." (Emphasis supplied.)

The Missouri River was in this period an alluvial river. This means that flow of the river itself makes the geometry of the channel (2902:4–16). During this period it carried large sediment loads because of the runoff from relatively barren lands adjacent to its boundaries (2903:1–11). These large sediment loads created tremendous erosive power (1498:20). Therefore, the flow itself makes its boundaries and the character of the flow is in turn influenced by the nature of its boundaries (2929–2931). It was a river that can best be described as in a state of constant change and movement except during periods of relatively low flow.

Because of the high quantity of sediment transported by the Missouri River during the period in question, the channel tended to meander or become sinuous, rather than flowing in a straight course (2915:1–12). It is generally accepted as a fact by all of the witnesses that the sinuousity or meanders of the river likewise tended to migrate

---

\* All references to the transcript shall be in parenthesis with the transcript page first followed by the line where the testimony may be found.

downstream during the course of various periods in time (900:5; 2076:17; 2574:18–2575:11). Therefore the channel of the river was constantly moving and changing its primary or principal course (1538:14). This resulted in erosion of certain land by the movement of the main channel of the river and deposition of sediment being carried by the waters which usually took place opposite where the erosion occurred (311:23; 839:20; 900:5; 1479:11; 2027:9; 2974:11–2948:4). This oftentimes left certain landforms remaining such as sloughs, bayous, lakes, dunes, sandbars and other topographical irregularities which can be geologically identified. (Exhibits G154 and Exhibit W–8.) Of additional significance is the nature of the soils which can be presently identified today, these soils consisting primarily of medium to fine sands, silts and clay which are not cohesive and easily erodible (2586:25–2587:16). These are the soils which would be typically found in an alluvial floodplain as being deposited during the course of river migrations.

## B. DEFINITION OF TERMS:

This Court has prepared and filed a memorandum opinion which analyzes and discusses the difficult choice of law questions presented in this case, as well as the definition of the terms accretion and avulsion. Reference to that memorandum opinion should be made for complete definitions which this Court has applied in arriving at these findings. However, it may generally be said that the various jurisdictions apply definitions of the processes of accretion and avulsion which are substantially similar. For purposes of clarity in these findings, this Court will apply the following general definitions:

(1) "Accretion" results from a gradual and imperceptible addition to the shoreline by action of the water to which the land is contiguous. The action of the water deposits silt and sediment which becomes accretion land. It may occur slowly or rapidly from the action of the river, but it is additional land which cannot be identified as having existed in its present location prior to a change in the location and course of the river which it abuts. When a river moves its course and location through the process of accretion, it has eroded away one of its banks and made depositions of silt and sediment against the opposite bank. The process of erosion destroys land on the bank opposite the accretion deposits by washing it away. The accretion deposits are at least partly composed of land which has been eroded away upstream, and carried downstream by the river in the form of silt until it is deposited against one of the riverbanks.

(2) "Avulsion" is the sudden shifting of the channel of the river and a body of land must be cut off so that after the shift it remains identifiable as land which existed before the change of the channel and which never became a part of the river bed. It is a sudden and rapid change in the channel of a stream where the old bed is abandoned and a new bed is formed in such a manner as to not destroy the integrity and identity of the land between the old and the new channels. Thus a primary distinction between accretion and avulsion is that avulsion does not erode away and replace by deposits of silt the land between the old and new channels.

(3) "The high bank" is a presently existing identifiable land feature of a higher elevation than the remainder of the floodplain in Blackbird Bend and represents the most northerly, easterly and southerly erosion by the Missouri River during the period in question in this case.

(4) "The right bank" is the Nebraska or most westerly bank of the river at any given point in time during the period in question.

(5) "The left bank" is the Iowa or most easterly bank of the river at any given point in time during the period in question.

(6) "The thalweg" is the center of the navigable channel of the river at any given time. It is not necessarily the "thread" of the river which is considered to be the line midway between the banks at the ordinary state of the water without regard to the location of the thalweg.

The dispute in this case is almost entirely factual and, to a large extent involves the interpretation of documentary evidence, i. e. maps and supporting documents between the period of 1852 until 1940, inasmuch as most of the witnesses living during that time have died. Only a few witnesses were still alive who observed the river in the early 1900s. Therefore, it becomes necessary to detail the evidence available during certain periods of time in order to resolve the conflicts as between the claims of the plaintiffs and those of the defendants.

## C. THE MISSOURI RIVER BETWEEN 1852 AND 1879

1. *1852–1867.* This period of time in history is of limited significance to the Court. The information that can be gleaned from the surveys and maps made during that period is somewhat limited. Since the instant case involves only title to land within the 1867 Barrett Survey, the actions and locations of the Missouri River within the period 1852 and 1867 have not created or caused a boundary dispute. Thus a discussion of the information between 1852 and 1867 is useful for purposes of background only. The first known survey was a left bank survey in 1852 by Deputy Surveyor Anderson of the General Land Office (Exhibit T22a–g). In 1855, following the treaty with the Omaha Tribe, Deputy Surveyor Barnum, General Land Office, surveyed the boundary of the Omaha Indian Reservation (Exhibit T8 and T8a). Neither Anderson nor Barnum surveyed the river or the opposite bank of the river in 1852 or 1855. In 1855 and 1856 a reconnaissance map of the river was prepared by Lieutenant G. K. Warren (Exhibit T23). In 1857 and 1858 a "tie" survey as between Iowa and Nebraska was performed by General Land Office Deputy Surveyors Hopkins and Haddock (Exhibits T25 and T25a–c and Exhibit W–E3). In 1867 General Land Office Deputy Surveyor Barrett surveyed the right bank of the river (Exhibit T26, T26a, W–G3, H3 and I3). Once again this survey provides no information as to the left bank at that time or the width of the channel of the river at the time that

survey was made. The Barrett Survey was conducted during the months of April and May. In the area in question the Barrett line is only a meander line following the outline of the bank of the river as it existed during April and May of 1867. As noted above, it did not purport to establish the boundary of the Reservation in the area in question, since the boundary was the thalweg of the river. *See Hardin v. Jordan,* 140 U.S. 371, 11 S.Ct. 808, 35 L.Ed. 428 (1891). Nevertheless, the location of the Barrett meander line can be established, and thus the line provides the only clearly marked line which can be used by a fact-finder as a basis to adjudicate boundary disputes. In fact, the Barrett line was used by the Court to limit and define the area of which the Tribe was granted possession in the preliminary injunction of June 5, 1975. For these reasons, and the procedural dilemma created by the fact of the Tribe's possession of the Barrett Survey Area discussed above, the trial of this case was limited to the Barrett Survey Area, and these findings and conclusions are also so limited. During that same year and after the Barrett survey, a map of the Missouri River was made by Colonel J. N. Macomb. (Exhibit T27). The Macomb map was compiled from sketches by Captain C. W. Howell of the Corps of Engineers and by Missouri River pilots and others. Exhibit T95 is a composite map showing the Barrett Survey of 1867 and the Macomb map readjusted by the witness Clark to fit the survey by Barrett. Plaintiffs concede by their testimony that the measurements are not accurate as far as distances on the Macomb map are concerned (210:23) and therefore the reliability of the composite Exhibit 95 is subject to some question. The defendants take these same maps and by the use of mylar overlays superimpose them upon a base map of the Blackbird Bend area (Exhibits W–P7, R7, S7, T7, U7, and V7). The obvious differences between the adjustments made by the plaintiffs on Exhibit 95 and the defendants' mylars makes it impossible for the Court to reconcile the correctness of the interpretation of either side. Since this

case is only concerned with the Barrett Survey Area, and since there is no dispute that the river was east of the Barrett line, disputes over the precise location of the Missouri River channel and thalweg as of 1867 have little significance in this case. The admitted distance inaccuracies on the Macomb map by the plaintiffs likewise makes their composite Exhibit 95 somewhat suspect in the mind of the Court. Therefore, the only real conclusion that the Court can make about the movement of the river between 1852 and 1867 is that there has been an eastward migration of the right bank meander lobe during this period of time with the river eroding against the left bank and accretion taking place on the easterly tip of the meander lobe as surveyed by Barrett. This is evident from the "low sandy point" as shown on the Barrett Survey which encompasses about the eastern mile or more of the meander lobe. Barrett's field notes (Exhibit T26E) indicates this is an area which is very low and sandy and subject to frequent inundation.[6] It is significant to note at this juncture that the expert witnesses produced in the trial of this case almost unanimously agreed that accretion land will form originally as point or middle bars; these bars are low and sandy, unstable, vegetation free and when subject to inundation are easily erodible (824:13; 844:7; 2586:25–2686:16; 2017:17).

That the easterly end of the Barrett meander lobe as surveyed was accretion is not seriously disputed by anyone. The maps and the evidence likewise reflect that during the period from 1852 until 1867 there was some southerly migration by the river which, under normal circumstances, would result in formation of some accretion on the opposite or northerly side of the river which would be accretion to the left bank (311:23; 839:20; 900:5; 1479:11; 974:14).

2. *1867–1875.* In the nine-year period between 1867 and 1875 there are no maps or surveys introduced in evidence which show the location or movement of the river during that period. However, from the Onawa Iowa Public Library there was introduced in evidence an historical atlas printed by A. T. Andreas in 1875 which purports to show the left bank of the river at or about that time (Exhibits T28 and W–L13). The reliability of the date and the accuracy of the atlas are questionable in view of the lack of information as to the source from which the atlas was made and the date of said source. It is apparent that during the period between 1852 and 1875 the river did move easterly, eroding the Iowa or left bank as it moved. Because this case is limited to the Barrett Survey Area, this Court will make no effort to pinpoint the location of the river during this period, and makes only a general finding that the river had moved to some point east of the Barrett line during the years 1852 to 1875 by the process of erosion and accretion.

3. *1875–1879.* This then sets the stage for the first area of principal dispute as between the parties. In 1879 the Missouri River Commission (forerunner to the U. S. Corps of Engineers) surveyed the Missouri River in the Blackbird Bend area (Exhibits T29, W–M3 and W–N3). Careful examination of the original survey maps shows the river width within the Barrett Survey at that time to be about 10,000 feet in width when measured from east-west. The 1879 map shows a crescent shaped bar immediately west of the easterly high bank which has been labeled on some of the exhibits as bar "A". (Exhibit W–N3) Westerly thereof is another crescent shaped bar which has been labeled as bar "B". The map makers have indicated by a common map making

**6.** Barrett Field Notes, General Description, Exhibit T26E, P. 520: "Fractional Township 29 N.R. 11 East the 6th Principal Meridian, is a low, sandy point, subject to frequent inundations from the Missouri River. Except a few small cotton wood trees and some willows, there is almost no vegetation upon it. The Missouri River is constantly changing its banks, so that no permanent corners can be established near the water; indeed, except where there are bearing trees, none of the corners in this Township will probably remain longer than the first high freshet in the Missouri. Small quantities of coal were deposited in the several mounds as per instructions, but the sandy soil will not prevent it from being washed away."

symbol that there is some willow vegetation on bar "A" but bar "B" appears on the map as simply a vegetation-free sandbar. Immediately west of bar "B" is a small "tear-shaped" bar which has been labeled as bar "C"—the map shows this bar has willows growing thereon. North and west of bars "b" and "C" is a series of sandbars which have been variously described by witnesses as having the appearance of a "fishbone"—these bars, like bar "B" are likewise vegetation-free.

It is the claim of the plaintiffs that between 1875 and 1879 the river was flowing against the easterly high bank and that between 1875 and 1879 an avulsion or avulsions took place and that the river abandoned its 1875 bed and by one, or two or more avulsions (291:17–Clark); or by one avulsion, probably in 1879 before June, 1879 (1161:9–14–Robinson); or by several major jumps (1502:8–McQuivey), and established its bed in the 1879 position.

The defendants on the other hand claim that the river moved after 1867 to its 1879 position by gradual erosion south and westward against the meander lobe as surveyed by Barrett in 1867 with deposition occurring on the opposite side of the erosion resulting in the formation of bar "A" as an accretion bar joined to the Iowa riparian land in Section 29, Township 84 North, Range 46 West and becoming later attached to the Iowa riparian land in Sections 28 and 34, in Township 84 North, Range 46 West (2603:13–2604:23; 2939:4–2944:5). The defendants point to certain facts to support their claims which the Court believes are relevant and logical:

(a) The vegetation on bar "A" as shown by the exhibits is willows. Willows are the first vegetation to appear as sandbars are formed because they will grow on sandbars that are subject to frequent inundation whereas cottonwoods need higher and drier land before growth is established. Willows will start to grow within one to two years after the bar surfaces (1390:20). This indicates therefore that bar "A" was of fairly recent origin and was not land in place left as the result of a sudden avulsive movement by the river. No witness for the plaintiff claims that any part of bar "A" is presently identifiable as land which was left in place following an avulsion (1660:20–1661:20; 1020:12–1022:10).

(b) Plaintiffs theorize that in 1875 the river was flowing against its easternmost bank, and was at that time a channel more than 800 feet wide. *Omaha Indian Tribe's Proposed Findings of Fact and Conclusions of Law, 38, Finding* No. 19. They further theorize that, in 1875, the river abandoned this 800 foot wide channel in an avulsion. *Id at 39, Finding No. 22, et seq.* Yet Tribe's Exhibit 99 locates bar "A" at a distance of much less than 800 feet from the easterly bank depicted there. This inconsistency supports this Court's finding that bar "A" is not "land-in-place" which was, prior to the 1879 river change, a part of the Blackbird peninsula on the Nebraska side of the river. Bar "A" as mapped in 1879 by the Missouri River Commission appears to be entirely composed of sand and willows. A remnant chute channel is shown on the exhibits as existing between bar "A" and the easterly high bank. The plaintiffs acknowledge that the width of that channel remnant is too narrow to be the width of the 1875 Missouri River channel. It is a common phenomenon, as described by the witnesses, that when a river moves away from its previous channel by the process of erosion of a point bar that it will close up the old previously existing channel at the upper end leaving a remnant chute (2179:8), (known locally as the "Iowa Chute") such as that found adjacent to bar "A" on the east.[7]

7. Judge George Prichard Testimony: "We called those the Iowa Slough. Always along the Iowa bank when these places formed, when the sandbars formed in the river, the water runs on both sides for a while. Then eventually up at the north end then the other side there would be a slough along the Iowa side. The main channel would usually work west. Then the upper end of the Iowa slough would close up. Low water or fill up, I don't know which. Then eventually the whole thing would close up. Although in this particular locality, English Bayou, which was below a mile or two, it stayed open after 1940, I know" (2430.11). "Q:

(c) Bar "B" is not identifiable land in place because it is barren of vegetation and therefore is obviously a middle sand bar which has recently formed during the westerly movement of the river between 1867 and 1879.

(d) Like bar "A", bar "C" has willow vegetation growing on it. Willows are the first vegetation to grow as waters recede (1390:20). Thus the mere existence of willows on bar "C" does not, standing alone, support a finding that bar "C" was left in place through an avulsion. The only other evidence that bar "C" is land-in-place is the fact that the 1879 maps locate bar "C" in the northeast corner of Section 19, Range 11 east, Township 24 north. This location is within the Barrett survey line and was on the Nebraska side of the river. From its review of the evidence, however, this Court finds that the land which had been located in the northeast corner of Section 19, Range 11 east, Township 84 north had been eroded away at some time prior to the 1879 Missouri River Commission map, and further finds that bar "C" is a middle bar which formed on that location as the river migrated west. Bar "C" had, by 1879, existed long enough to support willow growth. In this connection, it should be noted that, by 1890, the area in the northeast corner of Section 19, Range 11 east, Township 84 north, bears no vegetation which is described on maps as being different from vegetation on other areas in the surrounding land mass which had formed by 1890. (See Tribe's Exhibit 101.) If bar "C" were land-in-place which had existed prior to 1879, it would have supported the growth of cottonwoods or other vegetation more substantial than willows by 1890.

(e) Bar "D" cannot be identified as being land in place which existed at the time the

meander lobe was surveyed by Barrett because those bars are likewise middle sand-bars only and being barren of vegetation are therefore forming behind the southerly and westerly migration of the river as it moves to the southwest depositing accretion material on the opposite side of the channel during the course of its movement (2587:17–2589:13; 2948:5–2949:12).

(f) The shape, location, position and condition of bars "A", "B", "C" and "D" are consistent with the gradual southwesterly movement of the river away from an easterly high bank; a movement of that sort would erode away the meander lobe as surveyed by Barrett in 1867; such a movement would likewise deposit accretion on the side of the river opposite the erosion which is exactly what is seen in bars "A", "B", "C" and "D".[8]

(g) Of remarkable similarity, are the experiments of Captain Friedkin (Exhibit ZZ) which show the process by which accretion to the riparian land is formed by the meandering of alluvial rivers such as the Missouri.[9]

(h) Between 1867 and 1879 the meander lobe was low and at times entirely under the surface of the moving river. The Friedkin experiments and the hydrologic experience shows that during high water flows, the river will flow and erode against the upper side of the point bar as revealed by Major Suter (Exhibit XX, P. 1652). Therefore the main channel begins to move against the lobe eroding the same (2934:21–2937:7). As the lobe erodes, the channel migrates to the south and west. As the channel moves over the area where the lobe had existed, it removes remaining portions of the lobe by scouring itself a new channel.

---

Was this closing up of the Iowa chute at the upstream end a common occurrence from your observations as you hunted along the river? A: In my opinion that's the way they always formed. Q: From your observations? A: Yes." (2442:7)

**8.** Testimony of Dr. George Hallberg: "My opinion on those bars is very similar to what I have described for the formation of bar A. As the main channel of the river has shifted from the high bank to the west and to the south, we have in essence what I have been describing, back filling behind it in this area of low energy environment. Just as we have built bar A down in this point off in this direction, we have continued to build these bars down (2604:16–23).

**9.** See Exhibit ZZ, Plates 22, 53 and 61.

In other words, this shift in the course of the river is a consequence of progressive scour and deposition (the scour occurring against the meander lobe and the deposition occurring on the opposite side of the channel from where the scour occurs). The logical result of this deposition is the formation of bar "A" as shown on Exhibit W–N3.[10]

FINDINGS BY THE COURT—1852–1879

The plaintiffs base their case on the testimony of Mr. Clark, Dr. Robinson and Dr. McQuivey as to the movement of the river between 1875 and 1879. Their testimony in this regard is very vague and oftentimes uncertain. Mr. Clark simply recites that it is his opinion that between 1875 and 1879 the river by series of movements changed its channel from the 1875 position against the easterly high bank to its 1879 position as shown by the Missouri River Commission mapping (291:17). Although he doesn't know when. (612:17–23) Dr. Robinson is inconsistent with Mr. Clark in this regard inasmuch as Dr. Robinson thinks that the sudden avulsive movement as he described it occurred in 1879, before June (1161:9–14). Dr. McQuivey contradicts this by concluding that there were "several major jumps" (1502:8). A careful examination of the testimony and the mapping done in 1879 leaves little doubt in the mind of the Court but what Dr. Robinson is in error in his conclusions. If the avulsion had occurred in 1879 as Dr. Robinson opines, then it would be impossible for willows to be growing on bar "A", because the willows are growing at a place where the channel would have to have been flowing (1152:20). Obviously those willows growing along the easterly end of bar "A" would have been in the 1879 channel prior to the avulsion. Therefore

for the willows to be growing at that place as mapped by the 1879 Missouri River Commission would be an impossibility as even willows don't grow that fast. The testimony of Mr. Clark is likewise inconclusive. Elmer Clark is a surveyor with considerable experience, but he is neither a geologist nor a hydrologist (747:22).

On the other hand the testimony of Doctors Hallberg and Kennedy is extremely persuasive (2939:4–2944:18; 2567:18–2568:10; 2571:12–2576:13). Both are highly qualified, both educationally and by experience in their field and with the Missouri River. Their testimony is more clear and convincing to the Court and the most probable in the light of reason, common experience and the other evidence in the case. Their testimony is adequately supported by the testimony of Raymond Huber whose practical knowledge and expertise was gained by 37 years during which he traveled, studied and engineered the control of the wild and untamed Missouri River.

It is therefore the Finding By The Court that between 1852 and 1879 the Missouri River moved to its eastern-most position at a point east of and outside of the Barrett Survey Area. Having reached that most easterly location, the river, by a gradual progression during periods of high flow commenced a southerly and westerly migration away from the easterly high bank (2606:6–25). This caused the old channel against the easterly high bank to close at its upstream end by the process of deposition and siltation leaving a remnant of the old channel against the easterly high bank such as has been described by Judge Prichard (see footnote 7, supra). As the river moved in a gradual progression to the south and west it was eroding against the mean-

---

**10.** Testimony of Dr. John F. Kennedy: "Q. The question essentially is what's your opinion as to how bar A, as is shown on Exhibit N-3, and during the recess we put up U because it has the thalweg soundings on it. How was that formed during the period between 1875 and 1879?" (2947:11–15) "THE WITNESS: All right. I have testified that it is my judgment that this whole convex bar had been obliterated during this period of high flows that occurred in four years between '75 and '79. Now, as the

channel progressively moved to the west and with the thalweg shifting westward, this would become a river of diminished velocity, a slack water area or area of lowest velocity. Consequently, sediment that gets into this area would tend to be deposited because of the diminished sediment transport capacity of the water flowing in this area. Additionally, when this was all inundated there would be moving through it here an ensemble of very large sand waves or sand dunes." (2947:19–2948:7.)

der lobe as surveyed by Barrett in 1867 destroying and entirely washing the land surveyed by Barrett down the river (2955:17–2956:19). Deposition of silt, sands, and gravels (described by plaintiffs' counsel as "alluvion") was occurring during this process. This resulted in additions of new land to the left bank which new land was beyond the power of identification. It was in fact accretion to the Iowa riparian land-owners in Sections 29, 28, 34, 33 and 32 in Township 84 North, Range 46 West (2951:3–2952:15).

As a consequence by 1879 the action of the Missouri River had completely obliterated and washed away the meander lobe as surveyed by Barrett to almost the westerly edge of Iowa Sections 29 and 32 in Township 84 North, Range 46 West, as well as the lands surveyed by Barrett which fall within Iowa Sections 28 and 33 of Township 84 North, Range 46 West. As a consequence the Court finds that the claims by the plaintiffs that any lands within Iowa Sections 28, 29, 32 and 33, township 84 North, Range 46 West as being identifiable land in place as the result of an avulsion between 1875 and 1879 are not substantiated by the greater weight of the evidence. The Court finds by a preponderance of the evidence, that in 1879 any lands lying within Iowa Sections 28, 29, 32, and 33, Township 84 North, Range 46 West as surveyed by Barrett were new lands added by the process of erosion and accretion to the shoreline and were not identifiable as land which remained in place through the river movements and were accretion land to the Iowa riparian owners.

## D. THE MISSOURI RIVER BETWEEN 1879 AND 1890

1. *1881.* It is conceded by all of the witnesses that in 1881 a flood occurred on the Missouri River which recorded the highest flood waters of any time since reliable records have been kept. (Exhibit T97 and T104; Exhibit G124) In fact, Exhibit T97 reveals that the 1881 flood waters were ten feet higher than the June 16–20, 1879 water level (606:1–7). However, no maps were made of the Missouri River in the Blackbird Bend area between 1879 and 1890. Therefore, the effect upon the landscape in the Blackbird Bend area by virtue of the tremendous force of the 1881 flood is factually unknown. There is testimony, however, that during periods of high water flows, the river channel tends to straighten which will modify the channel configuration (1507:22; 2951:13–17). Following a flood of this magnitude the channel then begins to seek a new equilibrium and to consolidate its course (2959:8–15). Changes in the channel upstream from the Blackbird Bend area likewise are of considerable significance during this period of time (1508:10).

In 1890 the Missouri River Commission again mapped the channel as shown by Exhibits W–P3, T32 and T101. The mylar overlay, Exhibit W–Y7 when overlaid on W–X7 shows that the course of the river after 1879 and by 1890 has in fact straightened somewhat and has moved by migration somewhat to the north and to the east of its 1879 position. All parties agree that this northeasterly movement would be by erosion against the left bank with some accretion deposition occurring on the right bank.

There is however a very significant feature on the 1890 Missouri River Commission map which must not, at this point, be overlooked. The map clearly shows that lands located within Sections 28, 29, 32 and 33 in Township 84 North, Range 46 West, which had previously been within lands surveyed by Barrett in 1867 are now solidified and vegetated accretion land to the left bank Iowa riparian owners (Exhibit W–P3). This simply shows the normal and logical progression of the accretion which was shown to be forming in 1879 when the river was then mapped by the Missouri River Commission.

A thorough examination of Exhibit W–P3 which is a scale copy of the 1890 Missouri River Commission map with the Barrett survey line superimposed thereon shows a material change in the upstream channel from Blackbird Bend (McQuivey 1508:10 & 1538:20). It shows the formation

of a bend upstream which is similar in shape to the Barrett survey meander but not nearly as large in size. A long westerly oxbow on the approach to Blackbird Bend indicates erosion against the right bank and deposition in the form of a point bar on the left bank. Two other land features are shown which have been identified as being left as the result of the avulsive action of the river (2589:2–13). These are Blue Lake shown to the east of the Blackbird Bend and which was formed before 1852 (2827:17) and an old riverbed "cutoff 1875" which lies southerly of Blackbird Bend and which has been referred to in the evidence as Lake Quinnebaugh. The significance of these two features bears discussion (2593:18–2594:6). Recall the plaintiffs' claim that between 1875 and 1879 an avulsion occurred when the river allegedly left the easterly high bank and moved to its 1879 position as shown by the Missouri River Commission map. However, an examination of the land features in Blackbird Bend reveals that the land features are strikingly dissimilar to Blue Lake and Lake Quinnebaugh (2594:7–10; 2595:8–19). Those features indicate that when an avulsion occurred in the areas of Blue Lake and Lake Quinnebaugh it left the then river channel in substantially its then width, depth, shape and position. This formed an oxbow lake of significant size and depth. Had such an occurrence taken place between 1875 and 1879, as alleged by the plaintiffs, it is the Court's opinion that a similar land feature should have likewise remained and would have been so mapped in 1879. The absence of such a land feature is substantial evidence in the mind of the court that an avulsion did not take place between 1875 and 1879 in Blackbird Bend as alleged by the plaintiffs. Likewise the condition of the land in 1890 in Sections 28, 29, 32, and 33, Township 84 North, Range 46 West shows it to be covered with vegetation and trees and has by that time become all accretion to the Iowa riparian owners in Iowa Sections 28, 29, 32, 33, and 34, Township 84 North, Range 46 West.

## E. MISSOURI RIVER BETWEEN 1890 AND 1912

The evidence is somewhat uncertain as to the movement of the river between 1890 and 1912. There is an 1894 Monona County Survey of the left bank which is of some assistance as to the left bank of the river (Exhibit U–3). This does show a continued northeasterly migration of the left bank of the river which is consistent with the position of the river in 1890. The 1894 county survey shows the left bank in approximately the same location as shown by the Missouri River Commission in 1890, but an accretion bar has formed which is strikingly similar to bar "A", as shown on the 1879 map. There is a 1900 plat of accretions made by Monona County Surveyor R. S. Fessenden which is received in evidence (Exhibit Z–3). The 1900 Monona County surveyor shows accretions to government lots in Sections 28 and 33, Township 84 North, Range 46 West in Monona County, Iowa, and is recorded on January 23, 1901 in the office of the Monona County Recorder. Exhibit U–8 is an overlay of the 1900 Fessenden survey, Exhibit Z–8, showing the continued westerly movement of the accretions lands as shown by the 1890 survey.

An atlas map, published by the George A. Ogle Company in 1906, is received in evidence as Exhibit D–4, and the Tribe composite made from that map has been received in evidence as Exhibit T–102. This indicates some additional north and east migration of the left bank of the river but is of little assistance to the court as to the location of the right bank during this period. These are the only maps between 1890 and 1912. However, the general course of the river during this time indicates the development of a pattern which is somewhat similar to the easterly migration of the river during the period between 1852 and 1867. The river is meandering further north than it had in 1867, but not as far to the east (2639–2640). There is some erosion into the accretion which had previously formed adjacent to the Iowa left bank riparian owners (2642:22–2643:12).

## F. THE MISSOURI RIVER BETWEEN 1912—1923

In 1912 a left bank survey was accomplished by surveyors Fairchild and Oliver. This original survey has been received in evidence as Exhibit Q–8. Payment for this survey was authorized by the Monona County Board of Supervisors on March 5, 1912 as evidenced by Exhibit H–4. It was a survey of the Monona County west boundary, or as described by the minutes of the County Board of Supervisors, the "Missouri River Line". An examination of the exhibit leads to the obvious conclusion that it is the original survey map as made by surveyors Fairchild and Oliver upon which have been superimposed some Lewis and Clark camp sites by historian Mitchell Vincent (See, Exhibits T71 and T72).

The significance of the Fairchild survey (as it is referred to in the evidence) is two-fold. First, it shows the 1912 water line on the Iowa side of the river as surveyed by Mr. Fairchild. Secondly, in partial Section 24 and 25 of Township 84 North, Range 47 West and in partial Sections 19 and 30 of Township 84 North, Range 46 West it shows the development of a sandbar of rather substantial size which is obviously a point bar that has begun to develop by virtue of a change in the course of the upstream channel of the river (2650:6–2652:13). Because of the angle of the river channel upstream from the area where the Fairchild Survey map locates the Sandbar (See Tribe's Exhibits 102, 103), the river would have been eroding the right or Nebraska bank at a point upstream from the sandbar. This erosion would, according to the expert testimony, be very likely to deposit sand in the area depicted as sandbar in the Fairchild map. The formation of this bar began to occur sometime after 1894 and before the time of the 1912 Fairchild survey. The authenticity of the sandbar as shown on the Fairchild survey is challenged by the plaintiffs. They imply that the bar was mapped by someone other than Fairchild (perhaps Mitchell Vincent) or that the map was in some manner "doctored" either by the defendants or someone on their behalf (3143:12). A careful examination of the exhibit, together with other evidence and expert testimony as to the behavior of the Missouri River, leads the court to the conclusion that this exhibit is authentic and of assistance to the court. The defendants introduce in evidence Exhibits A through P. These exhibits are a series of letters from the Omaha Indian Reservation Agency Superintendent to the Commissioner of Indian Affairs during the period from 1907 and continuing until 1922. Thus, while they were not written by hydrologists they are accounts of the river's behavior which were prepared at a time when few reliable maps of an official nature are available, and are based on actual observation. They deal with the request by certain Indians of the Omaha Tribe or their heirs requesting that their allotments which had previously been granted to them of lands within the Omaha Indian Reservation be exchanged for new allotments. The reasons stated for the exchange requests were that the land originally allotted to the allottees was or had been washed away by the Missouri River. To better understand the relationship of these allotments and the relationship of the allotment exchange letters previously referred to, the court has examined Exhibit T80. The area in orange shown on Exhibit T80 is land which has never been allotted to any member of the Omaha Tribe and has never been patented by the United States Government to anyone; the area in green represents allotments which have been relinquished and are directly related to Exhibits A through P; the cross-hatched areas are lands which have been sold or otherwise left their trust status after the 1854 Treaty.

The plaintiffs disregard and disavow any significance to the allotment exchange letters (Exhibits A through P) (1135:18–1136:14) and assert that the verbiage used in the allotment exchange letters describing the action of the Missouri River as "washing away" the allotment lands is only the description of a nonprofessional person, unfamiliar with the action of the river. They conclude that the land was not "washed away" as described in the letters, but rather simply inundated by high water flows dur-

ing stages when the river was in flood. The defendants on the other hand relate the allotment exchange letters to the formation of the sandbar as shown by Fairchild in his 1912 survey. Exhibit F–4 was prepared by witness Huber, from the information contained in Exhibits A through P, S and T19. Mr. Huber then reconstructs what he believed to be the location of the right bank of the river in 1912 (2054:22–2059:7) in order that the right bank position might be compared with the location and position of the sandbar as shown by Fairchild. This reveals that the right bank, as reconstructed by Huber is consistent with the Fairchild sandbar. In support thereof, defendants, also introduce a sketch of the 1907 and 1908 river by one Thomas R. Ashley and a letter from the Superintendent of the Omaha Agency to the Commissioner of Indian Affairs enclosing a copy thereof which is dated October 23, 1908 (Exhibit R). The Ashley sketch and the letter to which it is attached describes the action of the Missouri River during that period as it relates to lands which are now located in Sections 24, 25, and 36 of Township 83 North, Range 47 West. The sketch of Mr. Ashley indicates that the river during that period is migrating in a southerly direction eroding against the right bank of the river washing away Indian allotment land and producing deposition on the left bank which is accretion to the Iowa riparian owners. Of some significance in this regard is also an Omaha Reservation Plat made by Reservation Farmer Corney O. Preston which is dated in May, 1914 and received in evidence as Exhibits I–4 and J–4. The witness Huber then prepared Exhibit L–4 which is a composite map showing the Fairchild survey as shown in Exhibit Q with the right bank line from the Preston plat (Exhibit I–4) and a reconstruction of a plat showing the allotted lands reportedly eroded away from the letters Exhibits A through P, as shown by Exhibit F–4. (2063:2–2064:7) The end result of all this tends to show the authenticity and reliability of the allotment exchange letters as they relate to the action of the Missouri River during this period in time.

In the light of the Indian allotment exchange letters, the Preston map and the Ashley sketches, the sandbar shown on the Fairchild 1912 survey becomes increasingly significant. It is the position of the plaintiffs in this case that the river was against the northerly high bank in about 1912. The witness Clark is of the opinion that the river left the northerly high bank in a sudden noticeable movement by one or more avulsions to reach its position in 1923 (455:7 and 524:19), however, he doesn't know how many (639:11) and he could find no records (779:20). He comes to this opinion because of the fact that there are sloughs running next to the northerly high bank which are the remains of the 1912 main channel. The sloughs to which Mr. Clark makes reference are primarily in Sections 19, 20, 28 and 33 in Township 84 North, Range 46 West. The remnants of these sloughs are evident on the ground today. The witness Dr. Robinson is of the opinion that between 1908 and 1916 there were several high water times which produced a change in the river to the south and it moved over toward the Nebraska bluffs and inundated the Barrett survey area and reached its 1923 position. It is his opinion that this occurred suddenly during one high water period (1067:13–1068:16).

Without commenting on the inconsistencies between the opinions of the witnesses Clark and Dr. Robinson, the Court believes that the following evidence contradicts those opinions:

(a) The slough areas found in Sections 19, 20, 28, 29 and 33 of Township 84 North, Range 46 West are more representative of the so called "Iowa Chute" than they are evidence of avulsions. As earlier indicated, an avulsion normally leaves a prominent landform remnant such as Blue Lake, which is shown on the 1946–47 Corps of Engineers Sheet # 72. (Exhibit U–8); or Badger Lake (Exhibit N–7A) or Lake Quinnebaugh (Exhibit P–3) (2593:18–2594:6). These lakes, formed by avulsive cutoffs, are sufficiently wide to indicate that they lie in an intact abandoned channel, rather than a remnant of a channel. The Court believes that if an avulsion had occurred between 1912 and 1923 a landform remnant should

have remained against the northerly high bank which would bear a reasonable resemblance to the lakes above referred to. The sloughs which remain are considerably more narrow and of less depth than would be evidenced by a sudden channel change which would leave the old river channel in place (2827:13–2828:17).

(b) Exhibit P–8 is an aerial photo mosaic of aerial photographs taken by the Corps of Engineers in 1925. Dr. McQuivey, a river hydrologist testified on behalf of one of the plaintiffs. It was his opinion that this aerial photograph showed evidences of many old channels which developed as the river progressed from the northerly high bank to its 1923 position. It was his opinion that these were main channels at one time. He marked on said exhibit in red the outlines of the old channels as he saw them (1683:23). His testimony is consistent with that of the witnesses of the defendants who state that after the river moved to the northerly high bank it then began to erode to the south during periods of high water depositing accretion materials to the left or Iowa riparian land as the progression took place (2679:10–2682:11; 2134:24–2139:2; 2967:1–2968:9). This is consistent with the sketch of Mr. Ashley, the Indian allotment exchange letters indicating erosion against the right bank with resultant deposition against the left bank, with the formation of the sandbar as shown by the 1912 Fairchild survey and with the testimony of Judge Prichard who was on the land in 1919 and described it as being all "bar" land with scattered sloughs, lakes, small willows no higher than a horse and a few scattered cottonwood trees (2432:4; 2423:12; 2435:9). It is also consistent with the angle of approach by the upstream channel as is shown by the Fairchild survey (Exhibit Q–8) (2650:6–2652:13).

(c) Plaintiff's witnesses acknowledge that there was an extremely wet cycle from at least 1910 to 1917 or 1918, as shown by the hydrograph prepared by the Witness Clark, as Exhibit T–112 (505:11). Mr. Clark likewise admitted that his Exhibit T–104 shows high water periods substantially above the elevation of 1045 feet in years 1905, 1906, 1912, 1913, 1915, 1916 and 1920. (578:17; 580:10–17). To like effect is the testimony of plaintiff's witness Dr. Robinson. (1052:15; 1062:1) The witness Ross Willey, then age 13, observed the river during the June rise in 1916. He marked on Exhibit M–5 the position along the northerly high bank where he rode on horseback and observed the river. (2008:8). He could see out across the main channel and could see the town of Decatur, and between where he sat on horseback and the town, he could see some bayous, water at different spots, weeds, small brush and bare spots where sand blows. (2402:7) In 1920 he became aware that Joe Kirk was trying to grow some sweet clover and alfalfa on some of the bare land that was just a little south and west of the present-day buildings; there were still a lot of sloughs and standing water areas and Kirk was doing a little clearing. (2404:23) Kirk continued in possession from 1920 until he sold out to the Petersons and was there every year farming and clearing. (2413:25) In 1919, Judge Prichard then a young lawyer, age 25, went on the bar with Joe Kirk in August or September. He marked on Exhibit J–5 the point where he and Kirk crossed the Iowa Chute with saddle horses (2423:3). He describes the area as "new bar land," with lots of small willows, sand dunes and small cottonwoods as big as maybe an inch and a half (2424:5). He saw no indication of any land that could be called land in place, other than the bar land, and no trees except new growth. (2424:23) He and Joe Kirk rode over the entire bar looking at the river, and just generally looking over the land. There was water standing in low places (2430:9) He describes the area to the north and west of where they entered the Kirk property as "just sandbar" with little willows and sand dunes and once in a while a patch of cottonwoods that they could ride through without any trouble. (2432:4) During this ride with Joe Kirk, he did not see any indication of any trees or land that appeared to him to have been cut off from the Nebraska side of the river. It just looked like "all new bar" to him. (2433:12) The whole area

looked to him as if it had started building up in the north end and had built gradually southward. It was many years before the southern land built up to that closer to the north high bank. (2437:23) He had observed the formation of land in this manner in other bends of the river because his family was interested in similar land called Hedges Bar. He describes the formation as a bar in the river with the water flowing on both sides and then it would close up at the upstream end and leave a kind of old remnant of the channel lying up against the high bank, which was called the Iowa Chute. (2440:6) The descriptions of the land by witnesses Willey and Prichard, who have absolutely no interest in the outcome of this litigation, is certainly the only clear picture of the land as it appeared at that time. If the land had been land in place as indicated by Clark and Dr. Robinson, it would have had more vegetation growing on it and vegetation should have been much taller than is described by the witnesses. The Court can conclude that the land described was formed by the gradual erosion of the river southward from the northerly high bank, with the deposition occurring in the Iowa side of the erosion, leaving sandbars, sloughs, bayous and other landform remnants which are typical of that type of river movement (2079:11). This lay testimony, based on actual observations, is of considerable significance.

(d) Another line of evidence in which the Court places reliance is the matter of the slope and gradient of the land throughout the entire Blackbird Bend area as it exists today. Dr. McQuivey's profiles of the Blackbird Bend area (Exhibit G–154) indicate the slope and gradient of the land as it presently exists to be gradually sloping from the west to the east (1620:25). The topographic cross-sections prepared by Dr. Hallberg (Exhibit W–8) reveals that those cross-sections show a general gradient and slope from the northwest to the southeast, so that surface water would drain through the area generally from the northwest to the southwest (2679:10–2682:11). This is consistent with the testimony of Drs. Hallberg and Kennedy, as to the manner in which the river migrated through the entire Blackbird Bend from the time when it reached the northerly high bank after 1890, until it reached its 1923 position, as shown by the Corps of Engineers. It is inconsistent with the theories of Mr. Clark and Dr. Robinson, who claim that the river migrated to the north and east after 1890, eventually reaching the northerly high bank and then jumping suddenly to its 1923 position. If this were in fact the case, as the Court understands the expert testimony, the slope and gradient for the drainage of surface waters should be to the northeast, rather than to the southeast as is indicated by the cross-sections.

This might also be a pertinent place to comment upon an inconsistency which in the Court's mind is of no small significance. It is the plaintiff's claim that whenever the river moved to the east to the easterly high bank and whenever it moved to the north and east to the northerly high bank, that it did so by the process of erosion against the left or Iowa bank, with corresponding accretion deposits to the right or west bank. However, whenever the river moved to the west or to the south, the plaintiffs claim that it did so by a "jumping action" so as to qualify in the eyes of the law as an avulsion. It strikes the Court somewhat strange that the river would move in two directions by erosion and in the two opposite directions by avulsion; in this regard, defendants have introduced evidence to the contrary (2601:22–2602:15; 2642:22–2643:12). A study of the Corps of Engineers maps from 1923 until as late as 1940 does not indicate to the Court in any manner that the river was "jumping" from one channel to another during that period of time; (2967:1–12) and a careful study of the maps reveals that whenever the river moved it always moved by erosion, whether it be east or west, north or south. This factor, coupled with a lack of any substantial evidence that the land was left as identifiable land following a particular movement lends considerable credence to the theory of the defendants while leaving considerable suspicion as to the theory of the plaintiffs.

(e) There is evidence in the record of a cottonwood tree which is 67 years old (1373:25) that was standing alone in Section 24, Township 84 North, Range 47 West. This tree was marked on Exhibit T–101, Exhibit T–105, Q and T–105A. The plaintiffs claim that the age of this tree supports their contention of an avulsion between 1912 and 1923, because if the tree was sixty-seven years old it had to have started growing in about 1908 or 1909; therefore, if the river had moved away from the northerly high bank by erosion, the tree should have been swept away by the action of the river. This assumes that the river was against the high bank in 1912, but there is some evidence that the river had left the northerly high bank by 1907 or 1908 (Exhibit R-Ashley sketch of 1907 and 1908 rivers). This Court is unwillingly, on the evidence, to join in the assumption that the river was at its northernmost position in 1912. It appears that the most that can be said about the northernmost position is that it was reached at some point between 1890 and 1912, but probably prior to 1912. The defendants on the other hand, contend that this tree was growing on the Fairchild sandbar and that explains its age. The location of the tree is marked as red dot surrounded by a circle by the Witness Virtue on Exhibit Q and is shown as being located on the edge of that bar. Plaintiff's witness Clark located the tree at a point 100 feet from the edge of the Fairchild sandbar (Exhibit 105–F). The Court is satisfied that when Fairchild made his survey in 1912, he did not survey the sandbar and, therefore the precise location thereof is not to be assumed from the survey map. This conclusion is supported by the fact that Judge Prichard saw no trees of any size in 1919. It is the Court's opinion that it is more likely that this tree commenced growing on the Fairchild bar than it is that the river moved avulsively as claimed by the plaintiffs. This conclusion is reached because of the fact that the lay and expert testimony most credible to the Court demonstrates that the river's change at this time was erosive and accretive rather than avulsive.

## FINDINGS BY THE COURT—1879–1923

The Court therefore concludes from a review of all of the evidence in this case, including the maps which are pertinent to the time period between 1890 and 1923, that the plaintiff's evidence falls far short of the evidence which would be necessary to prove an avulsion or avulsions. To the contrary, the testimony of the defendants' lay and expert witnesses, is the most clear and convincing to the Court's mind. Therefore, for all of the reasons which have heretofore been stated, the Court finds that there were no avulsions in the Blackbird Bend area between 1890 and 1923, and that the movements of the river during that period of time were erosive in nature so that accretion was being formed on the side of the river opposite the erosion. The Court finds that after 1890 the river moved erosively until it reached what is now the northerly high bank following which it commenced a southern migration throughout the Blackbird Bend area until it reached its 1923 position. This migration eroded almost all of the westerly end of the land as surveyed by Barrett in 1867 and the deposition which occurred during the southerly migration of the river was accretion to the northerly and easterly high banks and thereby became accretion to the Iowa riparian owners. The Court is satisfied that no other conclusion is tenable from the evidence in this case.

## G. THE RIVER FROM 1923 TO 1940

Generally, the witnesses are in agreement as to the interpretation of the Corps of Engineers maps, the first of which was made in 1923, and is in evidence in this case as Exhibits W–04; T–35 and T–105, composite. The 1923 map shows the river running generally in a north-south direction through the westerly end of Blackbird Bend, until it reaches a position in Iowa Section 36, Township 84 North, Range 47 West, when it makes a 90 degree angle turn to the east, where it traverses Iowa Sections 31 and a part of 32, Township 84 North, Range 46 West, whereupon it then turns south again and passes out of the

right bank meander as surveyed by Barrett. In view of the conclusions heretofore reached by the Court, the land lying east and north of the river in its 1923 position, has already been determined to be accretion land to the Iowa riparian owners. Therefore, the remaining question as to the migration of the river in this period of time is as to that land still within the Barrett meander survey line, which lies adjacent to the right bank of the 1923 river. Necessarily, an examination must then be made of the river as surveyed by the Corps of Engineers in 1927. The 1927 maps are received in evidence as Exhibits W–S4, T–36, and T–106, composite. It is apparent from an examination of the exhibits that after 1923 the river moved slightly to the east and then migrated south and west, leaving behind it a large point bar identified on the 1927 maps as "Low Bar". This low bar shows the remnant 1923 or later channel which is mapped by the Corps of Engineers as a "slough". Some other minor channel remnants are seen sticking into the low bar like fingers from the easterly side thereof. By 1927 the Corps has mapped the landforms (i. e. trees, bars, swamps, lakes, etc.) within the entire Blackbird Bend, which was not done by the Corps on its map in 1923. Although plaintiffs' witnesses disagree to some extent with the Corps mapping, the Court is of the opinion that the Corps of Engineers was in a better position in 1927 to verify the accuracy of its mapping than the plaintiffs would be by the current use of photo-interpretation of aerial photos made in 1925. On the 1927 map and east of the former 1923 river is shown large areas of marsh and lake, which the Court believes is further evidence of the southerly migration of the river after 1890. The 1927 map clearly indicates that much of the land was just beginning to develop as accretion to the Iowa riparian owners (2693:12–25; 2702:6–15). The vegetation shown on the 1927 map is likewise consistent with the testimony of Judge Prichard, who had been on the land in 1919. The low bar area shown on the 1927 map, is the beginning of accretion land to the Iowa riparian owners in Sections 32 and 31 of Township 84 North,

Range 46 West. The movement of the river between 1923 and 1927 was by erosion against the right bank and accretion deposition to the left bank.

The river from 1927 to 1940 is likewise fairly clearly traced. Private levees were constructed by Joe Kirk and later the Corps of Engineers constructed some pile dikes and an abatis to begin to train the river into its designed alignment. The 1937 reconnaissance map, Exhibit W–B5, shows some of the changes in the condition of the river from its 1930 alignment. These dikes and abatis had the effect of forming accretion to the Iowa riparian land adjacent to the dikes. (2093:24) There is no evidence between 1923 until 1940 of any avulsion that occurred either through the natural forces of the river or through man-made levees, dikes or abatis. (2103:1)

FINDINGS BY THE COURT—1923–1940

Therefore, the Court finds and concludes that all of the land formed to the east of the Missouri River as its channel was located in 1940, was accretion, either natural or man-made to the Iowa riparian landowners.

In 1943, the States of Iowa and Nebraska entered into a Compact Agreement which was based upon the 1940 position of the Missouri River in the Blackbird Bend area (Exhibit W–F5). The compact between the two states concluded once and for all that the land lying easterly of the compact line was located within the State of Iowa and that land lying westerly of the compact line was located within the State of Nebraska. The location of the compact line is not in dispute in this suit, and, therefore, the Court must finally conclude that all of the land lying east of the 1943 Iowa-Nebraska compact line is accretion land belonging to the Iowa riparian owners and is not owned by nor subject to claim by the Omaha Indian Tribe, or the United States of America, as Trustee for said tribe under the Treaty of 1854.

Although these factors did not influence the decision of the Court in these findings, the Court feels compelled to comment upon

the history of the activities of the defendants and their predecessors as it relates to the Blackbird Bend area. The evidence is without dispute that the Omaha Indian Tribe has not been in either possession or occupancy of the land within the Barrett Survey Meander since 1912 or before. There is considerable evidence in the record that the defendant's predecessor in title, Joe Kirk, came upon the land in approximately 1915 and commenced to clear and farm such areas of it as could be made farmable. From that time forward, the land was in the process of being cleared, drained, leveled, and improved for agricultural purposes by Kirk and others. There is in evidence in this case a certified copy of the Judgment and Decree of Cause No. 10093, District Court of Iowa in and for Monona County, entitled *George D. Whitney v. Joseph A. Kirk and Bertha Kirk,* wherein the Iowa District Court on November 30, 1928, concluded that Joseph A. Kirk was the owner of the Northeast Quarter of Section 19, Township 84 North, Range 46 West, lying upon the high bank, and that all land lying adjacent thereto was accretion land and as such, Kirk was entitled to title and possession of all lands lying south of a line commencing at the southwest corner of the Northeast Quarter of Section 19, Township 84, Range 46, and running in a southwesterly direction at right angles to the bed of the Missouri River and between said line and a line commencing at the southeast corner of said Northeast Quarter of Section 19 and running south to the bed of the Missouri River. (Exhibit W–CC) Although this Court realizes that that judgment and decree is not binding in any way upon the Court at this time, it is simply a further indication, from a different source, assumedly based on the evidence of witnesses at that time, that the land in Blackbird Bend lying southerly of the northerly high bank was formed by the process of accretion. Also in evidence, are Wilson Exhibits AA and BB, which are quiet title actions brought by the defendants or their predecessors in interest, of substantially all of the land with the Barrett Meander Survey, which quieted title to the riparian owners in 1962 and 1963 as against all persons except the United States. Finally, there is evidence in this case Exhibit W–D3 which is the Certificate of the Monona County Treasurer, showing payment of the taxes on the land within the Blackbird Bend by the defendants or their predecessors, since said land was placed upon the tax rolls.

There is no evidence of any possession by the Omaha Indian Tribe or of any improvements to the land by the Omaha Indian Tribe at any time even since temporary possession was granted by this Court by Temporary Injunction in 1975. All of these factors are of significance to the ultimate disposition of this cause as historical facts which have assisted and aided the Court in reaching a final determination.

## H. FINDINGS OF FACT ON THE MERITS

From all the evidentiary matters heretofore discussed, the COURT FINDS:

1) That the movement of the river from its 1867 position to its 1879 position was by gradual erosion against the banks of the river resulting in accretion deposition opposite the erosion; that there is no clear and convincing evidence of an avulsion during that time period which left land which could then or can now be identified as land in place.

2) That after 1879, the river moved erosively until it reached the present northerly and easterly high bank, sometime after 1890.

3) That after reaching the northerly and easterly high bank, the river then commenced a southern migration, eroding the right or Nebraska bank as it moved and depositing accretion on the left or Iowa side of the river until it reached its 1923 position as shown by Exhibit W–04; there is no satisfactory evidence of an avulsion which occurred between 1890 and 1923.

4) That after 1923 the river continued to move southerly until 1927. After 1927 the movements of the river were primarily east-west within the western end of the Barrett Survey but in all instances the

movements were erosive in nature and not avulsive.

5) That by 1940 all of the land previously formed within the 1867 Barrett Survey had been eroded away by the action of the river leaving no identifiable land in place and the new land within the Barrett Survey and easterly of the center of the 1940 river in Blackbird Bend was accretion to the Iowa riparian land to which it had attached.

6) The land owned by Roy Tibbals Wilson, RGP, Inc., Charles Lakin, Harold M. Sorensen and the State of Iowa lying within the Barrett Survey of 1867 and lying east of the 1943 Iowa-Nebraska Compact line is accretion to Iowa riparian land and neither the United States of America nor the Omaha Indian Tribe has any right or claim thereto.

7) The Omaha Indian Tribe has not been in possession for at least 40 years or more of the land referred to in the preceding paragraph but rather the defendants or their predecessors in title have been in possession.

8) As to Travelers Insurance Company, they are a mortgagee only and as such have not been in possession or dictated the use of said land.

From the foregoing Findings of Fact, the Court now makes the following:

## CONCLUSIONS OF LAW

### I.

The Court has jurisdiction of the parties and of the subject matter in controversy in these consolidated cases. The claims asserted herein by the plaintiffs, Tribe and the United States of America, arise under a Treaty of the United States and involve sums in excess of $10,000, exclusive of interest and costs. Jurisdiction is, therefore, conferred upon this Court by 28 U.S.C. §§ 1331, 1345 and 1362.

### II.

As discussed in the Memorandum Opinion on file herein, 433 F.Supp. 67, state law applies in determining this dispute, and plaintiffs are entitled to rely on Nebraska law to prove their title.

### III.

The burden of proof is upon the plaintiffs, Omaha Indian Tribe and United States of America, to prove their title to the land in dispute. The defendants also have the burden of proving the allegations of their counterclaim seeking quiet title relief. As discussed in the Memorandum Opinion on file herein, this Court concludes that neither plaintiffs nor defendants are benefitted by any presumption or other transfer of the burden of persuasion, and that this Court's findings are supported in this case by a clear and fair preponderance of all of the evidence.

### IV.

■ The plaintiffs failed to sustain their burden of proving that any sudden change of the Missouri River channel occurred in the Blackbird Bend area detaching a block of Omaha Indian Reservation land from the Nebraska bank to the Iowa bank, which land was capable of identification as such, either during the period from 1867 to 1879, 1906 to 1923, as contended by the plaintiffs, or at any other time material herein.

### V.

The defendants on the other hand, by their evidence have proven that the original Omaha Indian reservation land within the 1867 Barrett Survey has subsequently been washed away by the Missouri River and occupied by the bed thereof and that at the same time new land was added to the Iowa riparian land, from the owners of which defendants derive their title, by the gradual process of deposition within the Blackbird Bend area and specifically the land within the Barrett Survey to the 1943 Nebraska-Iowa Compact line.

At this point two observations about this litigation are in order: First, the *crucial* factual issues in dispute are relatively few; in fact the testimony of the defendants' experts and the government's expert can to

a large extent be reconciled. Secondly, there is at the core of this litigation a sharp dispute as to the legal classification of certain river movements which the evidence reveals. This is a lawsuit in which certain findings of fact, even if agreed upon, would not lead in the minds of all parties concerned to a definite legal conclusion; *i. e.* that either an avulsion or an accretion took place at key times in history at particular places on the Missouri River. It appears in this case that even if findings of fact could be agreed upon, the legal conclusions to be drawn from them would be vigorously disputed. This Court believes that a discussion of this problem of fitting the evidence into legal categories can make this Court's opinion more comprehensible. The dimensions of what is essentially a legal dispute are easily lost amid the wealth of evidence which was elicited to support very specific findings of fact.

The events which the Court is obliged to reconstruct occurred long ago and they were events of nature; so far as we know these events were not observed in their entirety by any person who could today be a witness concerning them. Indeed, there is some lay testimony that constitutes direct evidence relative to river movements early in this century, but none of this evidence in and of itself is sufficient for the construction of an overview of the river's actions at key times in history in the Blackbird Bend area. Yet an overview, not mere fragments of data, is a necessary predicate for conclusions in this case. Fact-finding must be, therefore, the creation of a synthesis of the fragments of data that pertain to the natural history of the Missouri River in the Blackbird Bend area.

In the process of pulling together the extensive and complicated evidence presented in this case, it becomes apparent that the movements of the Missouri River have not been so clean and precise that they easily fall into the legal categories conveyed by the terms "accretion" and "avulsion." This is *not* to suggest that at this time, after thorough examination of the evidence and the law, this Court holds an ambivalent attitude as to what legal conclusions should be drawn. This Court is convinced that one particular set of conclusions can be squared with the evidence far better than other proposed conclusions. We do suggest, however, that where the law demands precise concepts, nature has supplied the rather erratic behavior of the Missouri River. Holding up the concepts of accretion and avulsion and matching these concepts with our reconstructed view of former river movements is no easy task. The task requires intense analysis and very precise conceptual thinking.

The complexity of the evidence has required this Court to reflect upon the precise meaning of the terms "accretion" and "avulsion" in light of the evidence elicited in this case. In so doing it has become apparent that rendering a decision on the merits means not only that certain proposed findings of the plaintiffs must be rejected but also that certain erroneous legal thinking of plaintiffs must be rejected. Both government counsel and the Tribe's counsel have proceeded throughout this lawsuit with certain presuppositions as to what is required to prove either an accretion or an avulsion. These presuppositions are, in part, at variance with the legal meaning of the terms accretion and avulsion as this Court understands them. These differences in conceptualizing the requirements for a conclusion of accretion or avulsion are slight, but they are crucial and must be noted if the reasons for this Court's conclusions are to be comprehended.

The differences between the government's theory and the requirements of the law can best be illustrated by concentrating on the meaning of the term "avulsion." The government's pretrial statement of its theory of the case studied in conjunction with the testimony elicited by the government from its expert leads us to the following conclusion: the government's theory rests upon the assumption that the foremost and perhaps the single criterion for classifying a river movement as an avulsion is a sudden movement of the thalweg; thus under the government's theory an avulsion

can be defined with no reference whatever to river banks or other land forms. That assumption, we believe, cannot withstand critical scrutiny.

Assume that a stream evolves to have a braided character, *i. e.* it has several channels of various depths, the deepest of which contains the thalweg. According to the government's theory of avulsion, if the deepest channel begins to fill in with silt, then a point in time will come when another channel is deeper; hence, a new thalweg will suddenly appear. This sudden movement of the thalweg or emergence of a new thalweg, it is asserted, has the character of a "jump" and indicates that an avulsion has taken place.

The government's theory would compel us to recognize "jumps" (*ergo* avulsions) under many other circumstances. If the thalweg were hard against one bank of a river prior to an inundation and subsequent to the inundation appeared suddenly at another place in the river, the government's theory would no doubt necessitate the conclusion that an avulsion had occurred in view of the obvious fact that the thalweg had moved suddenly, in a few hours or a few days, to a new location.

That idea of an avulsion is innovative and thought-provoking but it cannot be reconciled with the common law legal concepts which we discussed earlier in this opinion. The government's criterion for recognizing an avulsion, a sudden movement of the thalweg, is inadequate to provide the conceptual framework for the resolution of this dispute if the Court adheres, as it must, to the common law concepts of accretion and avulsion.

The reasons are obvious. The government would have us recognize avulsions in a variety of river movements that leave no commonly accepted indicia of an avulsion, particularly land in place and an abandoned channel. Moreover, if the indicia of avulsion are cast aside, then the distinction between accretion and avulsion will become virtually meaningless.

The experts uniformly state that lateral river movements do not occur at a constant rate, for example, X feet per hour or per day. Due to the tremendous number of variables involved, movements of the thalweg may be sudden, seemingly erratic, and in some cases not immediately perceptible to a lay observer. Carrying the government's theory to its logical conclusion, many river movements historically known as accretions would be thrown over into the category of avulsions insofar as they result from river movements that are sudden and where the movement of the thalweg could rightly be characterized as a "jump."

In short, even if the question of government counsel (whether the river was jumping around at the times and places in question) were answered in the affirmative, the conclusion of an avulsion would not necessarily follow. We will not go so far as to assert that an avulsion can only occur when there is a chute cut-off or a neck cut-off, but it is necessary that identifiable land in place and evidence of an abandoned channel be visible subsequent to a river change before it can be classified as an avulsion.

The government has, no doubt, derived this theory of an avulsion from a more "scientific" analysis of the river movements than that which underlies the common law. From our vantage point at this time, it seems that if plaintiffs were to prevail in this suit, it could only have been by convincing this Court that this more "scientific" view of river movements, which would require constant attention to only the position of the thalweg, would be somehow harmonious with the common law. The evidence is simply insufficient to support findings that the traditional indicia of an avulsion existed at the key points in time.

The differences between this Court's analysis of the law and the views of the Tribe's counsel can best be illustrated by focusing upon the meaning of the term "accretion." It seems to this Court that the vigorous cross-examination of the defendants' experts by the Tribe's counsel revealed an operating assumption that involves the concept of accretion; namely: Tribe's counsel assumes that a conclusion of accretion can never be made without a find-

ing of continuity and contiguity between allegedly accreted lands and lands to which accretions allegedly attached. We find no error in this assumption itself, but do state that the terms "continuity" and "contiguity" themselves need to be analyzed. In this area the need for conceptual clarity is greater than ever.

Under the common law, as it is used in Iowa and Nebraska, a conclusion that accretion has occurred can only be made when land attaches to a shoreline; indeed, it is the growth of the shoreline that constitutes accretion. The accreted lands must, according to a commonly accepted doctrine, be above the ordinary high water mark. Therefore, continuity and contiguity are required and up to this point the reasoning of Tribe's counsel parallels that of this Court.

■ However, it appears that the view of the Tribe's counsel is slightly but crucially at variance with this Court's understanding of what is required to prove an accretion. In this Court's view the twin concepts of continuity and contiguity do *not* require either the absence of any and all surface water on all accretion lands at all times subsequent to attachment nor do they require a level, uniform extension of the shoreline by homogeneous soil-building materials.

First, we will consider the significance, if any, of water on lands alleged to be accretions. It is clear to this Court that the process of accretion can and often does occur in such a manner that puddles, sloughs and stagnant backwater of various common and technical descriptions are present for many years on low-lying portions of accreted lands and often at the juncture of accreted lands and lands to which they attach. The water may be the result of rainfall, a high water table or periodic inundation. Whatever its origin, the presence of water part of the time or even permanently at some sites does not in and of itself defeat the conclusion that an accretion has occurred. There can be contiguity and continuity of the land despite the presence of some water. As long as the mass of land which is purportedly an accretion is at-

tached to the former shoreline in such a manner that it appears to our common senses to be a growth of that old shoreline, then the land is accretion land.

It is this Court's view that the lands within the Barrett Survey area are now and for some time have been both continuous with and contiguous to the former Iowa shoreline. This means that they are accretion lands despite the presence of water which now and in earlier times interrupted to some degree the otherwise uninterrupted extension of the land.

■ We must also consider the question of whether the heterogeneous character of the soils throughout the Barrett Survey together with the vestiges of former river channels in that area defeat the conclusion that the area was formed by accretion. The answer is an unequivocal negative.

The soil throughout the area is *not* of a homogeneous composition. By the use of early aerial photography vestiges of former channels *can* be traced. This means that the Missouri River, to no one's great surprise, did not move at the uniform rate of speed at all times and did not pile up soils of a uniform character in the process. Yet, these facts do not negate the conclusion that the Barrett Survey area as it exists today is the result of a process of accretion; even less do they tend to prove an avulsion. This evidence is entirely consistent with the theory advanced by defendants. The key again is the growth of the shoreline. How that growth occurred, whether steadily or by jumps, whether uniformly or unevenly, is of no concern.

## VI.

Judgment will be entered in favor of the defendants, RGP, Inc., Roy Tibbals Wilson, Charles E. Lakin, State of Iowa, Harold M. Sorenson, and Travelers Insurance Company quieting title in them to the Barrett Survey land in controversy in these cases claimed by them respectively as against the plaintiff, Omaha Indian Tribe.

## VII.

The preliminary injunction herein granted on June 5, as extended and supplemented, will be set aside.

## VIII.

There is no basis for an injunction against Travelers Insurance Company as prayed in 4024 either to put the Indians in possession or to enjoin against interfering with possession and use by plaintiffs or as prayed in 4067 to enjoin from interfering with plaintiff's possession or denying access to or preventing harvest by plaintiffs.

## IX.

Travelers Insurance Company has a valid and enforceable first mortgage lien against the land owned by RGP, Inc. which is superior to any rights of the plaintiffs.

The foregoing shall constitute this Court's findings of fact and conclusions of law, and this Court's Memorandum Opinion on file herein shall be deemed to be the basis for its conclusions of law.

## DECREE

IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

1. Each and every one of the foregoing Findings of Fact and Conclusions of Law are by this reference made a part hereof.

2. The clear and convincing evidence is that the original "Barrett Survey" lands and accretions thereto have been entirely eroded and washed away by the erosive force of the river since 1867. The land in this litigation was not left by avulsive action of the river, but was formed by accretion to the riparian land on the Iowa side of the river, commencing sometime after 1867 and defendants' title is derived therefrom.

3. Plaintiffs' prayers for relief are hereby denied, and judgment is hereby given to the defendants on their counterclaims, and as between the defendants on the one hand and the plaintiffs on the other hand, title to the Barrett Survey land is quieted in defendants as their respective interests may appear.

4. All prior injunctions or orders of this Court to the contrary are dissolved.

5. The preliminary injunction entered June 5, 1975, which gave possession of the Barrett Survey area to the Omaha Indian Tribe is hereby vacated, dissolved and set aside.

6. All monies from plaintiffs' farming operations which have been deposited with the clerk of this court are the property of the defendants as their interests may appear.

7. Causes numbered C–75–4024 and C–75–4026 and that portion of C–75–4067 involved in this trial are dismissed, without costs to either party.