GNB BATTERY TECHNOLOGIES, IN-CORPORATED, formerly known as GNB, Incorporated and GNB Industrial Battery Company, Plaintiffs–Appellants,

v.

GOULD, INCORPORATED, Defendant–Appellee.

No. 94–1956.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 30, 1994.

Decided Sept. 6, 1995.

vine & Quinlan, Chicago, IL, for plaintiffs-appellants.

Irene Savanis, Paul W. Schroeder (argued), Carol A. Ahern, Jones, Day, Reavis & Pogue, Chicago, IL, for defendant-appellee.

Before FLAUM, RIPPLE and GARZA,[*] Circuit Judges.

RIPPLE, Circuit Judge.

GNB Battery Technologies, Inc. and GNB Industrial Battery Company (collectively "GNB") appeal the district court's determination that GNB assumed liability for toxic waste generated by Gould's battery business at sites other than those sold to GNB. For the following reasons, we affirm the decision of the district court.

## I

## BACKGROUND

### A. *Facts*

Since the nineteenth century, Gould has been involved in the business of the manufacture, sale and reclamation of batteries. Facilities related to this business were located throughout the United States. Waste generated in Gould's battery business, some of which is now considered hazardous under federal environmental laws, was disposed of "on-site" at its plant locations across the country or "off-site" at various common disposal facilities.

In the early 1980s, Gould, a publicly-held conglomerate, undertook a general corporate restructuring that involved selling off three primary divisions of its battery business.[1] In order to facilitate the sale of its battery business, Gould formed a wholly-owned subsidiary, GNB Batteries, Inc. ("GNB Batteries"), to which it then transferred the business and assets of its battery business. The transfer was accomplished through a Bill of Sale and Assignment, effective January 1, 1983.

Donald B. Hilliker, Roseann Oliver (argued), Marie A. Halpin, Phelan, Cahill, De-

---

[*] The Honorable Emilio M. Garza, United States Circuit Judge for the Fifth Circuit, sitting by designation.

1. Gould's battery business consisted of three divisions: an automotive battery division, an industrial battery division, and a metals division (hereinafter the "Battery Divisions").

Beginning in April 1983, Gould offered to sell all the stock of GNB Batteries to interested purchasers. Stanley Gaines, one of Gould's senior vice-presidents, subsequently became interested in buying GNB Batteries from Gould. Together with Frank Beaudette, the Controller of Gould's automotive battery division, and Daniel Heffernan, a partner in the New York investment banking firm of Allen & Company, Gaines formed GNB Acquisition Corp. for that purpose.

Gould's Board of Directors appointed Gaines as President of GNB Batteries. Three months later, Gould accepted GNB Acquisition Corp.'s bid for the purchase of GNB Batteries. From May 1983 until April 1984, Gould negotiated with GNB Acquisition Corp. over the terms of the sale. In December 1983, Gould and GNB Acquisition Corp. executed a Restated Purchase Agreement that detailed the terms of the sale of GNB Batteries. Gould also executed a Restated Assumption Agreement with GNB Batteries in which GNB Batteries agreed to assume "any and all obligations and liabilities of any nature ... of Gould relating to the businesses and operations of the [Battery] Divisions incurred by Gould or the Divisions prior to [April 6, 1984], except as otherwise provided in Exhibit A hereto and for the following obligations or liabilities:...." Richard Williams, who served as Gould's Senior Vice President and General Counsel and as GNB Batteries' Vice President, executed the assumption agreement on behalf of both Gould and GNB Batteries.

At the close of purchase, GNB Acquisition Corp. merged into GNB Batteries. GNB Batteries was later renamed GNB Incorporated and then GNB Battery Technologies, Inc. ("GNB"). GNB, one of the appellants, later incorporated Industrial Battery Co., the other appellant, as a wholly-owned subsidiary.

Five or six years after the closing of the Gould–GNB transaction, serious environmental problems relating to the battery business began to surface. The liability for such environmental damage is significant. Under the Resource Conservation and Recovery Act ("RCRA") and the Comprehensive Environmental Liability Act ("CERCLA"), the Environmental Protection Agency ("EPA") may hold a responsible person strictly liable for cleanup costs. Under CERCLA, however, a responsible party may be indemnified for its liability. The present conflict involves the extent to which GNB is responsible for environmental damage created by Gould during its 70+ years of battery business operation. GNB has agreed that it will indemnify Gould for any environmental liability deriving out of toxic waste stored at any facility sold to GNB. However, GNB asserts that it is not responsible for environmental liabilities that have arisen at Gould plants or common dump sites closed prior to the 1984 sale. In Gould's view, GNB assumed all the environmental liabilities of Gould's Battery Divisions, including (1) liabilities connected with facilities sold by Gould prior to 1983, when it transferred its battery business into GNB Batteries, and (2) liabilities connected with Gould's disposal of wastes at common facilities before 1983.

## B. District Court Proceedings

In April 1990, GNB filed a two-count declaratory judgment action against Gould. In the first count of its complaint, labeled "Declaratory Judgment Under CERCLA," GNB requested a declaration that "GNB is not a potentially responsible party under Section 107(a) of CERCLA, 42 U.S.C. § 9607, for the hazardous waste disposed of by Gould at its battery manufacturing facilities not acquired by GNB or by Gould at common facilities." R.1 at 12. In the second count, termed "Declaratory Judgment Under Contract," GNB requested a declaration that, "[u]nder the Restated Assumption Agreement, GNB did not undertake responsibility for Gould's liability for environmental cleanups or damages for any Gould properties or manufacturing facilities ... [or] ... for common facilities." R.1 at 15. Gould filed a two-count counterclaim with its answer to GNB's complaint. Gould's counterclaim duplicated, in many respects, GNB's complaint. In Count One, it sought a declaration that GNB was liable to it under CERCLA, and in Count Two, it sought a declaration that GNB was responsible under the Restated Assumption Agreement for Gould's environmental liabili-

ties complaint. Gould also raised a breach of warranty claim in which it alleged that GNB had breached its contractual obligation by its refusal to indemnify Gould.

In November 1990, the district court granted summary judgment against GNB on the breach of warranty claim but otherwise dismissed the counterclaim. In April 1992, both parties filed additional motions for summary judgment on the remaining claims, and in September, the district court denied the motions in part, concluding that a genuine issue of material fact existed as to whether the Restated Assumption Agreement transferred environmental liabilities for prior Gould operations to GNB.

At trial, the district court concluded that the Restated Assumption Agreement unambiguously transferred the disputed environmental liabilities to GNB. The court stated that, even assuming that the Restated Assumption Agreement was ambiguous, "the parol evidence presented at trial strongly supports our finding that Gould intended to convey, and GNB Acquisition understood that it was assuming, all of Gould's liability arising out of its earlier dumping and storage of toxic waste." Mem.Op. at 13.

## II

## ANALYSIS

Before turning to the merits of the dispute which the parties bring to us, we turn first to a matter of jurisdiction. "That the parties have not contested, nor the district court considered jurisdiction does not impede our inquiry. We are required to satisfy ourselves not only of our own jurisdiction, but also the jurisdiction of the district court." *Commercial Nat'l Bank v. Demos,* 18 F.3d 485, 487 (7th Cir.1994) (citations and quotations omitted).

### A. *Subject Matter Jurisdiction*

■ The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides:

In a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

However, because the Declaratory Judgment Act is not an independent source of federal subject matter jurisdiction, *see Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 671, 70 S.Ct. 876, 878–79, 94 L.Ed. 1194 (1950), the district court must possess an independent basis for jurisdiction. In this case, GNB premises jurisdiction over Count One on "federal question" jurisdiction. *See* 28 U.S.C. § 1331. The "presence or absence of federal-question jurisdiction is governed by the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Burda v. M. Ecker Co.,* 954 F.2d 434, 438 (7th Cir.1992).

Under the "well-pleaded complaint" rule, "federal law must create the cause of action, or some substantial, disputed question of federal law must be an element in the plaintiff's claim." *Commercial Nat'l Bank v. Demos,* 18 F.3d 485, 488 (7th Cir.1994); *see generally Ceres Terminals, Inc. v. Industrial Comm'n,* 53 F.3d 183 (7th Cir.1995). In declaratory judgment cases, the well-pleaded complaint rule dictates that jurisdiction is determined by whether federal question jurisdiction would exist over the presumed suit by the declaratory judgment defendant. *Nuclear Eng'g Co. v. Scott,* 660 F.2d 241, 253 (7th Cir.1981), *cert. denied,* 455 U.S. 993, 102 S.Ct. 1622, 71 L.Ed.2d 855 (1982). In this case, Count One of GNB's complaint presumes the possibility of an action by Gould under §§ 107(a) and 113(f)(1) of CERCLA, 42 U.S.C. §§ 9067(a), 9613(f)(1), a federal cause of action.[2] Thus, GNB's complaint is a

---

2. Section 107(a) permits a party that has incurred "necessary costs of response" consistent with the national contingency plan to sue four different potentially responsible parties—present

and past owners of the site, off-site generators and others who arranged for treatment and disposal at the site, and transporters who brought waste to the site. *See* 42 U.S.C. § 9607(a); *see*

request for a declaration of nonliability under CERCLA. It therefore constitutes an adequate request for declaratory relief and supports our federal question jurisdiction.

■ To complete our inquiry about the jurisdiction of the district court, "we must address the separate and distinct jurisdictional question of constitutional dimension" of whether an "actual controversy" existed over GNB's liability to Gould under CERCLA. *See Nuclear Eng'g Co.*, 660 F.2d at 251; *see also Deveraux v. City of Chicago*, 14 F.3d 328, 330 (7th Cir.1994) ("The Supreme Court recently has reminded us that '[t]he exercise of judicial power under Art. III of the Constitution depends on the existence of a case or controversy,' and 'a federal court [lacks] the power to render advisory opinions.'") (citations omitted). We have recognized that "the distinction between a 'controversy' in the Article III sense and an abstract question of law 'is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy.'" *Deveraux*, 14 F.3d at 330. Nevertheless, "[t]he test to be applied to determine the existence of an actual controversy in the context of a declaratory judgment action is 'whether ... there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Nuclear Eng'g Co.*, 660 F.2d at 251–52 (citations omitted). In this case, in which a declaratory judgment plaintiff files an action in anticipation of a threatened action by the declaratory judgment defendant, the real and immediate possibility of such litigation is sufficient to create a justiciable controversy. *See Cardinal Chem. Co. v. Morton Int'l, Inc.*, —— U.S. ——, ——–——, 113 S.Ct. 1967, 1974–75, 124 L.Ed.2d 1 (1993). Looking only to the complaint,[3] we must assure ourselves that the possibility of suit under CERCLA is sufficiently real and immediate. In making this judgment, we must evaluate the complaint as a whole and assess the totality of the circumstances. *See Trippe Mfg. Co. v. American Power Conservation Corp.*, 46 F.3d 624, 627 (7th Cir.1995).

In evaluating the complaint, we also must remember that, just as federal courts have an obligation not to exercise jurisdiction that they do not have, they also have an obligation to decide cases that are within their jurisdiction. It is well established that pleadings in declaratory judgment actions are subject to the same rules of notice pleading as all other actions. *See* 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1238, at 285 (1990). There are no special pleading requirements for environmental lawsuits; the standards that apply in all other federal lawsuits apply here as well. Absent congressional direction through statute or action under the Rules Enabling Act, it is not our prerogative to legislate higher stan-

---

also *Kerr–McGee Chem. Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321, 325 (7th Cir.1994) (enumerating elements of CERCLA liability). GNB alleged in its complaint that Gould had incurred such response costs.

Section 113(f)(1) provides that potentially responsible parties have rights of contribution against each other:
(1) Contribution. Any person may seek contribution from any other person who is liable or potentially liable under section [107(a)] of this title, during or following any civil action under section [106] of this title or under section [107(a)] of this title. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section [106] or section [107] of this title.
42 U.S.C. § 9613(f)(1).

3. In determining jurisdiction, we do not look beyond the complaint. Ordinarily, we determine jurisdiction from the face of that complaint without any investigation into the facts underlying the complaint. Where a party or the district court have raised questions about the factual predicates to jurisdiction, the party invoking jurisdiction may be required to support its jurisdictional allegations with competent proof. *NLFC, Inc. v. Devcom Mid–America, Inc.*, 45 F.3d 231, 237 (7th Cir.1995); *Grafon Corp. v. Hausermann*, 602 F.2d 781, 783 (7th Cir.1979). Because our concerns with jurisdiction in this case do not extend beyond the face of the pleadings, we need not look further. *See Pennell v. San Jose*, 485 U.S. 1, 7, 108 S.Ct. 849, 855, 99 L.Ed.2d 1 (1988).

dards in this type of case or in any other case. *Cf. Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* — U.S. —, — – —, 113 S.Ct. 1160, 1161–63, 122 L.Ed.2d 517 (1993) (holding that a heightened standard of pleading, judicially created, is not permitted in civil rights cases).

GNB's complaint specifically asks for a declaration of nonliability under CERCLA. As we acknowledged in *Kerr–McGee Chem. Corp. v. Lefton Iron & Metal Co.,* 14 F.3d 321 (7th Cir.1994), the question of CERCLA liability and the interpretation of any indemnification agreement among the parties liable for the clean-up are inextricably related. Of particular importance is the reality that statutory liability under CERCLA endures even if contractual liability is later determined to be non-existent. Because, under the "totality of the circumstances," GNB has alleged sufficiently that Gould seeks to impose CERCLA liability on it, there is an adequate basis for a case or controversy to exercise jurisdiction.

Indeed, to the degree that the issues of CERCLA liability and contractual liability are inextricably interrelated, the district court was presented not with a question of justiciability in the constitutional sense, but with a prudential concern as to whether, in the context of a declaratory judgment action, it was appropriate to grant declaratory relief on the applicability of CERCLA. We believe this issue is best left to the sound discretion of the district court. *See Wilton v. Seven Falls Co.,* — U.S. —, —, 115 S.Ct. 2137, 2144, 132 L.Ed.2d 214 (1995). The district court expressed no reservation about entertaining the facially appropriate request for declaratory relief with respect to the plaintiff's liability under CERCLA. It detected no attempt to invoke artificially its jurisdiction to decide a controversy that was more academic than immediate. We see no reason to question that judgment.

### B. *Prematurity of Appeal*

■ GNB challenges our appellate jurisdiction on the ground that the district court's order is not a final decision. *See* 28 U.S.C. § 1291. It submits that the district court failed to enter a final order declaring the rights of the parties. It further submits that the pendency of litigation for additional relief under 28 U.S.C. § 2202 renders any declaratory judgment non-final. We shall examine each of these contentions.

Upon examination of the record, we cannot agree that the district court failed to declare adequately the rights and obligations of the parties. When the laconic Rule 58 judgment is read with the accompanying opinion of the district court, it is clear that the court declared the rights of the parties. *See Massey Ferguson Div. of Varity Corp. v. Gurley,* 51 F.3d 102, 105 (7th Cir.1995); *Abbs v. Sullivan,* 963 F.2d 918, 923 (7th Cir.1992); *see also Kunkel v. Continental Casualty Co.,* 866 F.2d 1269, 1273 n. 3 (10th Cir.1989).

Nor do we believe that the pendency in the district court of an action for additional relief under 28 U.S.C. § 2202 makes the declaratory judgment of the district court non-final. We agree with the other courts that have confronted the issue that proceedings for relief under this section are not the functional equivalent of a motion to alter or to amend the judgment.[4] Indeed, the very purpose of a motion under this section of the judicial code is not to change the declaratory judgment but to enforce it. *See Abbs v. Sullivan,* 963 F.2d 918, 923 (7th Cir.1992).

### C. *Liability and the Restated Assumption Agreement*

■ Our review of the district court's interpretation of the purchase agreement and other related documents is a matter of law, subject to the de novo standard of review. *Central States v. Hartlage Truck Serv., Inc.,* 991 F.2d 1357, 1361 (7th Cir.1993). In con-

---

**4.** *See Gant v. Grand Lodge,* 12 F.3d 998, 1001–02 (10th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1834, 128 L.Ed.2d 462 (1994); *Insurance Servs. of Beaufort, Inc. v. Aetna Casualty & Sur. Co.,* 966 F.2d 847, 851–52 (4th Cir.1992); *Omaha Indem. Ins. Co. v. Cardon Oil Co.,* 687 F.Supp. 502, 503 (N.D.Cal.1988), *aff'd,* 902 F.2d 40, 1990 WL 55904 (9th Cir.1990); *Horn & Hardart Co. v. National R.R. Passenger Corp.,* 659 F.Supp. 1258, 1263 (D.D.C.1987), *aff'd,* 843 F.2d 546, 548–49 (D.C.Cir.), *cert. denied,* 488 U.S. 849, 109 S.Ct. 129, 102 L.Ed.2d 102 (1988).

struing contractual agreements,[5] we shall "give effect to the reasonable expectations of the parties." *Lowrance v. Hacker*, 888 F.2d 49, 51 (7th Cir.1989); *see In re Envirodyne Indus., Inc.*, 29 F.3d 301, 305–06 (7th Cir. 1994) (holding that we must interpret a contract in light of the concrete circumstances in which it was written). To preserve such expectations, a contract must be considered in its entirety; all documents that are entered into simultaneously, should be construed together.[6] If it is determined that the relevant documents are unambiguous, the court need not consider the trial parol evidence, and should give the plain meaning of the documents effect without resorting to rules of contract construction. *Harris Trust & Sav. Bank v. Hirsch*, 112 Ill.App.3d 895, 68 Ill.Dec. 383, 386, 445 N.E.2d 1236, 1239 (1983); *see Ryan v. Chromalloy Am. Corp.*, 877 F.2d 598, 602 (7th Cir.1989).

### 1. The Restated Assumption Agreement

The operative document in this case is the Restated Assumption Agreement. This document was structured to transfer liabilities from Gould to its wholly-owned subsidiary, at the time, GNB Batteries. Gould and GNB Batteries were the only signatories to the agreement.

#### a.

■ The district court did not err in determining that the Restated Assumption Agreement, alone, unambiguously transferred all of Gould's Battery Division liabilities to GNB. The language of the Restated Assumption Agreement was sufficiently broad to encompass any CERCLA liabilities that may arise. An agreement need not expressly reference CERCLA to transfer liability under CERCLA; paragraph three of the Assumption Agreement effectively transferred CERCLA liability to GNB Batteries.[7] *See Olin Corp. v. Consolidated Aluminum Corp.*, 5 F.3d 10, 14 (2d Cir.1993) (concluding that an agreement transferring "all liability" transfers responsibility for all CERCLA liability, even if it does not expressly reference CERCLA).

■ GNB contends that the Restated Assumption Agreement should be interpreted to encompass only prospective CERCLA liabilities relating to the particular Battery Group plants and assets conveyed by Gould in the Bill of Sale executed in 1983. We agree with the district court, however, that such an interpretation conflicts with the plain language of the Restated Assumption Agreement. When interpreting a contract, we cannot read terms into the language that are not expressly stated, *see Heath v. A.B. Dick Co.*, 253 F.2d 30, 33–34 (7th Cir.1958), nor will we ignore terms that are explicitly written therein. A contractual interpretation that gives reasonable meaning to all of the terms in an agreement is preferable to an interpretation which gives no effect to some terms. *See Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560, 564–65 (7th Cir.1995). With these principles in mind, we cannot accept the

---

5. Both parties agree, and the contracts provide, that Illinois law governs the interpretation of the documents.

6. *Berkeley Properties v. Balcor Pension Investors II*, 227 Ill.App.3d 992, 169 Ill.Dec. 576, 579, 592 N.E.2d 63, 66 (1992); *In re Klinker's Estate*, 399 N.E.2d 299, 301 (Ill.App.Ct.1979); *see also Preze v. Board of Trustees*, 5 F.3d 272, 274 (7th Cir. 1993) (holding that a document should be read as a whole so that all of its parts will be given effect); *Lippo v. Mobil Oil Corp.*, 776 F.2d 706, 713 n. 13 (7th Cir.1985) (holding that related documents must be read together).

7. Paragraph 3 of the Restated Assumption Agreement provides:

On the Effective Date, GNB shall assume, pay, perform or discharge as they become due any and all obligations and liabilities of any nature (whether accrued, absolute, contingent or otherwise) of Gould relating to the businesses and operations of the Divisions incurred by Gould or the Divisions prior to the Effective Date, except as otherwise provided in Exhibit A hereto and for the following obligations and liabilities:

  (a) any obligations or liabilities arising from the claims or causes of action listed and described on Exhibit B attached hereto and made a part hereof (collectively referred to herein as "Retained Litigation"); and

  (b) liabilities or obligations arising from claims, proceedings or causes of action resulting from property damage or personal injuries caused by products manufactured by the Divisions, the occurrence of which is prior to the Effective Date.

R.123, Ex.F at 2–3.

proposition that Gould limited the environmental liabilities associated with its Battery Division, with the exception of those liabilities specifically exempted, to the prospective liabilities for facilities that were purchased in 1983; to hold otherwise would eviscerate the import of many terms in the Restated Assumption Agreement.

We especially note the existence of the three specific exemptions provided in paragraph three of the document. The enumeration of these exemptions indicates that the parties intended to exempt only the situations that they specifically itemized. *See Fuja v. Benefit Trust Life Ins. Co.,* 18 F.3d 1405, 1409–10 (7th Cir.1994); *Petrilli v. Drechsel,* 910 F.2d 1441, 1447–48 (7th Cir.1990). It is particularly important that specific exemptions provided in paragraph three involved matters that related to incidents that occurred at Battery Division sites that were not owned by GNB at the time of sale. If the document is to be read as exempting all former liabilities relating to the Battery Divisions, as GNB contends, it would not have been necessary to exempt specifically the former sites. We cannot accept GNB's proposition, and consequently concur with the district court that such an interpretation effectively would make the language of such exemptions superfluous.

GNB additionally submits that the use of the word "incurred" in paragraph three of the Restated Assumption Agreement limits its liability. The relevant portion of paragraph three of the Restated Assumption Agreement provides that Gould transferred to GNB Batteries "any and all obligations and liabilities ... incurred ... prior to the Effective Date." R. 123, Ex. F at 2. Consequently, GNB contends, liabilities are not "incurred" under CERCLA until "(1) hazardous substances are released or have been threatened to be released from the facility; and (2) the release or threat of release has required that response costs be expended by the United States, an individual state or a private party." Appellant's Br. at 31 (citing *United States v. Union Scrap Iron & Metal,* 123 B.R. 831, 837 (D.Minn.1990)).

The district court concluded that such a reading would render the rest of the language of the Assumption Agreement meaningless, and thus would be an impermissible construction. We agree. First, as we have stated, Illinois law provides that all words in a contract are to be given their plain ordinary meaning.[8] Given this principle, the word "incurred" can be interpreted only as referring to the actions that would give rise to liability. Because the acts giving rise to CERCLA and RCRA liability already had occurred at the time of sale, the language and structure of the Agreement require that the Agreement encompass all environmental liabilities transferred at purchase.[9] CERCLA hardly requires, expressly or by implication, that a document transferring environmental liabilities use the necromantic definition of "incurred" offered by GNB. In fact, GNB's interpretation of the term "incurred" fails to give meaning to a significant portion of paragraph three. Paragraph three states that "GNB shall assume ... any and all liabilities of any nature (whether accrued, absolute, contingent or otherwise)...." Plainly, the Agreement contemplated the transfer of all of Gould's liabilities whether they were known or not, and whether they had been identified and responded to or not.

We reiterate that the very existence of the specific exemptions of liability in paragraph three militates against concluding that the Agreement did not transfer all of the liabilities and obligations of Gould except those specifically delineated. One of the exemptions listed in paragraph three, termed "Retained Litigation" in Exhibit B, excepted several environmental liabilities deriving out of former Battery Division facilities. Using

---

8. *La Salle Nat'l Trust, N.A. v. Village of Westmont,* 264 Ill.App.3d 43, 201 Ill.Dec. 725, 740, 636 N.E.2d 1157, 1172 (1994); *USG Interiors, Inc. v. Commercial & Architectural Prods., Inc.,* 241 Ill.App.3d 944, 182 Ill.Dec. 277, 609 N.E.2d 811 (1993).

9. *See SmithKline Beecham Corp. v. Rohm & Haas Co.,* 854 F.Supp. 1201, 1206 (E.D.Pa.1994) ("The

term 'liability' has an extremely expansive meaning. *Black's Law Dictionary* states that the term 'has been referred to as of the most comprehensive significance, including almost every character of hazard or responsibility, absolute, contingent or likely.' ") (citation omitted).

GNB's limited definition of "incurred" would render this exemption meaningless because GNB would not have assumed any such types of liabilities in the first instance. Accordingly, we agree with the district court that "incur" was not so limited.

### 2. The Other Purchase Documents

■ GNB further contends that the Restated Assumption Agreement (effective Dec. 31, 1983) and amendment (entered into Apr. 6, 1984) must be read in conjunction with the Bill of Sale (effective Jan. 1, 1983) and the Restated Purchase Agreement (executed in Dec. 1983) because they were "entered into simultaneously." GNB submits that, when the documents are read together, the Restated Assumption Agreement should be interpreted as to not transfer all environmental liabilities. This approach presents, however, several difficulties. First, the documents were not executed at the same time and therefore should not be interpreted together. *See Lippo v. Mobil Oil Corp.*, 776 F.2d at 713 n. 13. The original Assumption Agreement (executed Jan. 1, 1983), from which the majority of the language of the Restated Assumption Agreement originated, was executed significantly before the Restated Purchase Agreement.

Second, the purpose of the Restated Assumption Agreement—to transfer all liabilities concerning the battery business to Gould's subsidiary—precludes such a view. The purpose of the Bill of Sale was to transfer all tangible and intangible property and assets associated with Gould's Battery business. By contrast, the Restated Assumption Agreement was intended to transfer obligations and liabilities of Gould. To this end, Gould presented testimony that its intent was to extricate the company from *all* environmental liabilities. *See* Appellee's Br. at 13. Key participants in GNB received drafts of the Restated Assumption Agreement; GNB's Mr. Gaines was involved intimately in the Gould–GNB Battery transfer. It is difficult to conclude that GNB was not aware of Gould's desire to transfer all liabilities, or that GNB actually believed that it was not assuming all the environmental liabilities,

contingent or not, that derived from Gould's 70+ years of battery operations.

### 3. Ambiguity and Parol Evidence

■ Although we believe that the relevant documents are not ambiguous, we shall nevertheless address GNB's submission that the district court improperly construed the Restated Assumption Agreement by failing to consider the intent of GNB, and instead considering only the knowledge of some of the members involved in the Acquisition Corp. We review such an issue for clear error; we must give great deference to the trial court's determination of the relative merit and credibility of parol evidence. *Anderson v. Bessemer City*, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).

■ Parol and extrinsic evidence are helpful to a court when it is confronted by a contract that is ambiguous. *See Occidental Fire & Casualty Co. v. Continental Bank, N.A.*, 918 F.2d 1312, 1315 (7th Cir.1990). In considering the extrinsic evidence, the district court focused on the knowledge of key GNB personnel. Under the circumstances presented here, we do not believe that the district court can be faulted for this approach. Adopting this perspective hardly shows that the district court confused knowledge with intent. Rather, the knowledge of the GNB personnel who were involved in the negotiations is highly relevant and probative on the issue of intent. *See Farm Credit Bank v. Whitlock*, 144 Ill.2d 440, 163 Ill.Dec. 510, 513, 581 N.E.2d 664, 667 (1991). The district court had every right to probe why GNB personnel failed to insert any language specifically absolving GNB from liability even though they were intimately involved in the sale transaction and were aware of the environmental liability potential. Gould and its subsidiary, GNB, were the only signatories on the Restated Assumption Agreement. The uncontroverted evidence presented at trial indicated that Gould "intended to sell its battery operations—the good and the bad and the ugly." *See* Mem.Op. at 13–14.

Also, we do not accept GNB's argument that the intent of the parties must have been to limit transfer of environmental liabilities

because Gould's sweep process (a preliminary investigation by Gould) did not address former Gould battery sites that might have contained potential environmental problems. The district court was entitled to be more impressed with GNB's absence of concern about the matter. No concern over the potential liabilities was raised with Gould. The district court was also entitled to assign significant weight to the letter from the law firm of Briggs and Morgan advising GNB about the potential environmental problems arising out of the purchase. The letter provided:

> [The] acquisition of obligations and liabilities will generally include all known and unknown environmental liabilities and problems, except as set forth in the December 13, 1983 Agreement at paragraph 2.07(a). This acquisition of potential environmental liabilities is consistent with my understanding of the philosophy of this transaction [GNB Acquisition] intends to take the positive and negative aspects of the battery business.

Defendant's Tr.Ex. 171 at 1. The district court stated that although Mr. Larson, the author of the letter, testified at trial that the letter referred only "to environmental liabilities relating to the assets conveyed to GNB Acquisition, his letter makes no such distinction." Mem.Op. at 15. We must defer to the court's decision about the weight to be assigned to this evidence.

After reviewing the entire record, we are not left with a definite and firm conviction that a mistake has been committed; the district court took a permissible view of the evidence. We can require no more. *See Anderson v. Bessemer City,* 470 U.S. at 573, 105 S.Ct. at 1511; *Roper v. Peabody Coal Co.,* 47 F.3d 925, 927 (7th Cir.1995). In sum, the evidence of record supports the conclusion that GNB was on notice of the potential environmental liabilities. The district court was entitled to conclude that the absence of further discussion supports the conclusion that GNB intended to assume the disputed liabilities. The district court acted well within its authority in making the conclusions

that it did make. We find no error in the district court's consideration and interpretation of the extrinsic and parol evidence offered in regard to the Restated Assumption Agreement.

### Conclusion

For the foregoing reasons, the decision of the district court on the merits is affirmed.

AFFIRMED.

EMILIO M. GARZA, Circuit Judge, dissenting:

While I agree with the majority that GNB's request in Count One of its complaint for a declaration of nonliability under CERCLA arises under federal law, I do not agree that Gould alleged the existence of an actual controversy over Gould's CERCLA liability to GNB. Because the actual controversy requirement is a "separate and distinct jurisdictional question of constitutional dimension," *Nuclear Engineering Co. v. Scott,* 660 F.2d 241, 251 (7th Cir.1981), *cert. denied,* 455 U.S. 993, 102 S.Ct. 1622, 71 L.Ed.2d 855 (1982), I would therefore conclude that the district court lacked federal jurisdiction over Count One.[1]

To support its conclusion that GNB adequately alleged the existence of an actual controversy, the majority points to the fact that "GNB's complaint specifically asks for a declaration of nonliability under CERCLA." It cannot be true, however, that a request for a declaration of nonliability is sufficient to allege the existence of a pre-existing actual controversy. Otherwise, a party could obtain an advisory opinion merely by requesting a declaration of nonliability, thereby undermining the requirement that an actual controversy precipitate the declaratory judgment action.

The majority suggests that GNB's request for a declaration of nonliability under CERCLA is sufficient because CERCLA issues are "inextricably related" to the interpretation of an indemnification agreement. Under this view, an actual controversy over the scope of an indemnification agreement will so impli-

---

1. For reasons I explain below, I also would hold that the district court lacked federal jurisdiction over Count Two, and thus over GNB's entire complaint.

cate CERCLA liability that such a dispute will necessarily include an actual controversy over CERCLA liability.

The case the majority cites for this proposition illustrates that this relationship exists only in some circumstances. In *Kerr–McGee Chemical Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321 (7th Cir.1994), this Court pointed out that in allocating response costs in a CERCLA contribution action,[2] the relevant factors for consideration include "any contracts between the parties bearing on the allocation of cleanup costs." *Id.* at 326. Thus, a CERCLA contribution action will often incorporate a dispute over the parties' contractual allocation of CERCLA liabilities, and the threat of a CERCLA contribution action may indeed imply an actual controversy over contractual liability.

However, the converse is not necessarily true. It does not follow from *Kerr–McGee Chemical* that a court must resolve CERCLA liability to interpret an indemnification agreement. One need only examine the majority's interpretation of the Restated Assumption Agreement in this case to see that no issues of CERCLA liability are "inextricably related" to the interpretation of this contract. *See* majority opinion, *supra* at Part II.C. Therefore, a dispute over the meaning of an indemnification agreement does not imply the threat of a statutory contribution action under CERCLA.

The majority's analysis also suggests that the actual controversy issue is, to some degree at least, a "prudential concern" that is "best left to the sound discretion of the district court," citing *Wilton v. Seven Falls Co.*, —— U.S. ——, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995). *Wilton* recites the well-established principle that a district court possesses discretion to *decline* to exercise its jurisdiction under the Declaratory Judgment Act. *See id.* at ——, 115 S.Ct. at 2140. However, the district court's discretion over whether to grant a declaratory judgment comes into play only when an actual controversy exists.[3] In my view, the sufficiency of a declaratory judgment plaintiff's actual controversy allegations has nothing to do with a district court's discretion not to exercise its declaratory judgment jurisdiction.

The majority's reliance on the relationship between CERCLA liability and contractual liability in *Kerr–McGee Chemical*, combined with its reliance on the district court's discretion in this case, has allowed it to avoid one nagging reality. Nowhere in GNB's complaint is it alleged that Gould either threatened GNB with a CERCLA contribution action or did anything to suggest that such a suit was imminent.

In order to have invoked the district court's jurisdiction under the Declaratory Judgment Act, GNB's complaint was required to present a "case of actual controversy."[4] This Court has recognized that "the

2. *See* 42 U.S.C. § 9613(f)(1) (1988) ("Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title.").

3. *See* 28 U.S.C. § 2201 (1988) ("*In a case of actual controversy* within its jurisdiction, ... any court of the United States ... *may* declare the rights and other legal relations of any interested party seeking such declaration...." (emphasis added)); *Brillhart v. Excess Ins. Co. of America*, 316 U.S. 491, 494, 62 S.Ct. 1173, 1175, 86 L.Ed. 1620 (1942) ("Although the District Court had jurisdiction of the suit under the Federal Declaratory Judgments Act ..., it was under no compulsion to exercise that jurisdiction."); *Deveraux v. City of Chicago*, 14 F.3d 328, 330 (5th Cir. 1994) (noting district court's discretion and stating, "It is also true, however, that courts may not exercise their discretionary power in the absence of an 'actual controversy' between the parties"); *Atlanta Int'l Ins. Co. v. Atchison, Topeka and Santa Fe Ry. Co.*, 938 F.2d 81, 83 (7th Cir.1991) ("The Declaratory Judgment Act ... gives courts of the United States discretionary power to issue declaratory judgments. One of the predicates to the exercise of this power is that there be an actual controversy.").

4. 28 U.S.C. § 2201. This requirement "tracks the 'cases' or 'controversies' requirement of article III." *Harris Trust and Sav. Bank v. E–II Holdings, Inc.*, 926 F.2d 636, 639 (7th Cir.) (citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937)), *cert. denied*, 502 U.S. 866, 112 S.Ct. 192, 116 L.Ed.2d 152 (1991). "The Supreme Court recently has reminded us that '[t]he exercise of judicial power under Art. III of the Constitution depends on the existence of a case or controversy,' and 'a federal court [lacks] the power to render advisory opinions.'" *Deveraux*, 14 F.3d at 330 (quoting *Unit-*

distinction between a 'controversy' in the Article III sense and an abstract question of law 'is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy.' "[5] Nevertheless, "[t]he test to be applied to determine the existence of an actual controversy in the context of a declaratory judgment action is 'whether ... there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.' "[6] Whether such a controversy exists is determined "by reference to the time when the action was commenced," *Nuclear Engineering Co.*, 660 F.2d at 251, and if a controversy forms at a later stage in the litigation, it will not cure a jurisdictional defect, *cf. id.* at 253 (holding that "[s]ince NEC's complaint presented no actual controversy when filed, the district court should have dismissed the action," but noting that the controversy had since ripened into an actual controversy).

In a case such as this one, in which a declaratory judgment plaintiff files an action in anticipation of a potential action by the declaratory judgment defendant, the threat of litigation is sufficient to create a justiciable controversy.[7] " 'The defendant must have engaged in conduct giving rise to a reasonable apprehension on plaintiff's part that it will face ... suit *or the threat of one if it commences or continues the activity in question.'* "[8]

Consequently, we must determine whether GNB alleged a threat of CERCLA litigation that would cause it reasonably to apprehend a suit by Gould asserting CERCLA liability. In Count One of its complaint, GNB alleged as follows:

41. An actual controversy exists between GNB and Gould in that Gould contends, and GNB denies, that GNB is responsible for the liability which Gould incurs for the costs of environmental cleanups at the East Point, Georgia and Monroe, Michigan sites and at the common facilities in Granite City, Illinois, Monterey Park, California and Minneapolis, Minnesota.

42. This controversy between the parties is ripe because Gould has already committed to clean up the lead contaminated soil at the Monroe, Michigan site, has incurred *response costs relative to this undertaking*, and has stated its intention to hold GNB responsible for these costs and the costs Gould incurs relating to the East Point, Georgia; Minneapolis, Minnesota; Granite City, Illinois and Monterey Park, California sites.

Read out of context, the words "responsible for" are ambiguous; they could mean responsible under the Restated Assumption Agreement, and they could mean responsible under CERCLA. Other allegations in the complaint establish, however, that "responsible for" means responsible under the Restated Assumption Agreement:

20. After the Closing Date, *Gould engaged in a course of conduct consistent*

ed States Nat'l Bank v. Independent Ins. Agents of America, — U.S. —, —, 113 S.Ct. 2173, 2178, 124 L.Ed.2d 402 (1993)).

5. *Deveraux*, 14 F.3d at 330 (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941)).

6. *Nuclear Engineering Co.*, 660 F.2d at 251–52 (quoting *Maryland Casualty Co.*, 312 U.S. at 273, 61 S.Ct. at 512); *accord Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 506, 92 S.Ct. 1749, 1755, 32 L.Ed.2d 257 (1972).

7. See *Cardinal Chem. Co. v. Morton Int'l, Inc.*, — U.S. —, —, 113 S.Ct. 1967, 1974–75, 124 L.Ed.2d 1 (1993) (noting that threat of infringement suit in intellectual property context could create "actual controversy"); *Lake Carriers'*

*Ass'n*, 406 U.S. at 507–08, 92 S.Ct. at 1755–56 (holding that threat of enforcement of statute created "actual controversy"); *Trippe Mfg. Co. v. American Power Conversion Corp.*, 46 F.3d 624, 627 (7th Cir.1995) (noting that threat of trademark infringement suit would be sufficient to create "actual controversy"); *Nuclear Engineering Co.*, 660 F.2d at 252 (stating that threat of enforcement of statute could create "actual controversy").

8. *Trippe Manufacturing*, 46 F.3d at 627 (quoting *International Harvester Co. v. Deere & Co.*, 623 F.2d 1207, 1210 (7th Cir.1980)). "The focus on the inquiry must rest on the defendant's statements and conduct since an 'apprehension alone, if not inspired by the defendant's actions, does not give rise to an actual controversy.' " *Id.* (quoting *International Harvester*, 623 F.2d at 1211).

*with the provisions and intent of the Restated Assumption Agreement* and in keeping with its representations and warranties in the Restated Assumption Agreement *by accepting responsibility for liabilities it incurred under CERCLA* and other environmental laws relating to the battery manufacturing facilities owned by Gould and with respect to waste treated or disposed of by Gould at common facilities.

21. Since 1988, however, *Gould has taken a position contrary to the terms of the Restated Assumption Agreement and has asserted that GNB is responsible for liabilities that Gould incurs under CERCLA* and other environmental laws relating to the battery manufacturing facilities owned by Gould and with respect to waste treated or disposed of by Gould at common facilities.

22. Specifically, . . . .

26. In 1989, Gould demanded that GNB accept responsibility for any and all of the necessary costs of response incurred in connection with the cleanup of the East Point, Georgia site for which Gould was liable.[9]

. . . .

29. In October, 1989, Gould demanded that GNB accept responsibility for any and all of the necessary costs of response incurred in connection with the cleanup of the Monroe, Michigan site for which Gould was liable.[10]

. . . .

33. GNB has . . . refused to accept responsibility for any necessary costs of response for which Gould is liable in connection with the cleanups of the Monroe, Michigan and East Point, Georgia sites.

(emphasis added). The remainder of the specific allegations describing the controversy are worded similarly, further demonstrating that Gould's alleged attempt to hold GNB responsible for the response costs it incurred at the various named sites was grounded in its interpretation of the Restated Assumption Agreement, which differed from GNB's interpretation.

These allegations may show that there was a live dispute between Gould and *other parties* regarding *its* CERCLA liability, but the actual controversy must be between the parties to the declaratory judgment action.[11] The allegations may also show that an actual controversy existed between Gould and GNB regarding GNB's responsibilities under the Restated Assumption Agreement, but the declaration sought must relate to the threatened action.[12] Thus, I would hold that Count One fails the actual controversy requirement because GNB's complaint contains no allegation that Gould had threatened to sue GNB *under CERCLA.*[13]

---

9. GNB alleged that the current owner of the East Point, Georgia, site had "asserted that Gould was responsible under CERCLA for the necessary costs of response incurred in connection with the cleanup of the site."

10. GNB alleged that the current owner of the Monroe, Michigan, site had "filed suit against Gould to recover the necessary costs of response it [had] incurred and [would] incur to clean up the site."

11. *See Harris Trust*, 926 F.2d at 639–40.

12. *See Zimmerman v. HBO Affiliate Group*, 834 F.2d 1163, 1170 (3d Cir.1987) (holding that because it was "purely a matter of conjecture whether the defendants had threatened to file suit on the theory on which the plaintiff has requested a declaration . . . the dispute lacked the immediacy and reality necessary to require a judicial declaration of rights as between the parties").

13. *See Trippe Mfg.*, 46 F.3d at 627 (holding that no actual controversy existed because declaratory judgment defendant had not threatened trademark infringement suit and totality of circumstances did not reasonably suggest that suit was imminent).

Although I reach this conclusion based on the allegations in GNB's complaint, the summary judgment and trial records in this case confirm that no dispute had formed over GNB's CERCLA liability. Letters from Gould to GNB, which supported GNB's allegation that Gould was seeking to hold it responsible for Gould's CERCLA liabilities, specifically refer to the Restated Assumption Agreement but make no reference to GNB's potential liability under CERCLA.

I also note that my reading of GNB's complaint does not rely on "heightened pleading requirements for environmental lawsuits." GNB alleged the existence of an actual controversy over the interpretation of a contract and did not allege an actual controversy over CERCLA liability. The problem with GNB's allegations is not that they are too general or conclusory; if anything, GNB's allegations are too specific.

Count Two, in which GNB sought a declaration of nonliability under contract, cannot sustain federal jurisdiction because it does not arise under federal law. As the majority states in its opinion, when a declaratory judgment plaintiff seeks a declaration of nonliability, federal question jurisdiction depends on whether federal question jurisdiction would exist over the presumed suit by the declaratory judgment defendant.[14] Under § 1331, "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331 (1988). "The 'vast majority' of cases that come within this grant of jurisdiction are covered by Justice Holmes' statement that a 'suit arises under the law that creates the cause of action.'"[15] However, the Supreme Court has also noted that "a case may arise under federal law 'where the vindication of a right under state law necessarily turned on some construction of federal law.'"[16]

GNB's request in Count Two for a declaration of nonliability under contract contemplates a breach of contract suit by Gould, a state cause of action, and the vindication of Gould's rights under the Restated Assumption Agreement turns solely on the application of Illinois contract law. See majority opinion, supra at part II.C. Thus, Count Two does not arise under federal law, and the district court lacked federal question jurisdiction over it.

In a supplemental brief defending the district court's jurisdiction, Gould contends that the district court properly exercised federal question jurisdiction over Count Two because federal common law governed the interpretation of the Restated Assumption Agreement. It is well settled that § 1331 will support claims founded upon federal common law.[17] Gould cites to a line of cases holding that federal common law governs indemnification agreements involving CERCLA liabilities and further holding that state law provides the federal common law rule of decision.[18]

First, I note that the majority does not purport to apply Illinois law as a federal common law rule of decision. See majority opinion, supra at part II.C & n. 5. Second, this Court has held that state law governs the interpretation of indemnification agreements involving CERCLA liabilities without stating that state law provides the federal common law rule of decision. See Harley-Davidson, Inc. v. Minstar, Inc., 41 F.3d 341, 344 (7th Cir.1994), cert. denied, — U.S. —, 115 S.Ct. 1401, 131 L.Ed.2d 289 (1995) (holding that scope of indemnification agreement involving CERCLA liabilities "depends simply on the wording of the agreement interpreted in light of applicable state law governing indemnification agreements; there is no question of federal law").

Third, the cases on which Gould relies in support of its argument that federal common

14. *Nuclear Engineering Co.*, 660 F.2d at 253 (citing *Public Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 248, 73 S.Ct. 236, 242, 97 L.Ed. 291 (1952)); *see also Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 19, 103 S.Ct. 2841, 2851, 77 L.Ed.2d 420 (1983) (noting that "[f]ederal courts have regularly taken original jurisdiction over declaratory judgment suits in which, if the declaratory judgment defendant brought a coercive action to enforce its rights, that suit would necessarily present a federal question" (footnote omitted)).

15. *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804, 808, 106 S.Ct. 3229, 3232, 92 L.Ed.2d 650 (1986) (quoting *Franchise Tax Bd.*, 463 U.S. at 8–9, 103 S.Ct. at 2846 (quoting *American Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260, 36 S.Ct. 585, 586, 60 L.Ed. 987 (1916))).

16. *Id.* at 808–09, 106 S.Ct. at 3232–33 (quoting *Franchise Tax Bd.*, 463 U.S. at 9, 103 S.Ct. at 2846).

17. *National Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 850, 105 S.Ct. 2447, 2450–51, 85 L.Ed.2d 818 (1985); *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 666–67, 94 S.Ct. 772, 777, 39 L.Ed.2d 73 (1974); *Illinois v. City of Milwaukee*, 406 U.S. 91, 100, 92 S.Ct. 1385, 1391, 31 L.Ed.2d 712 (1972).

18. *Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454, 1457–60 (9th Cir.1986) (holding that federal common law governed interpretation of CERCLA indemnification agreement but applying New York law as federal common law rule of decision); *accord Beazer East, Inc. v. Mead Corp.*, 34 F.3d 206, 211–15 (3d Cir.1994) (same, applying Alabama law as federal common law rule of decision), *cert. denied*, — U.S. —, 115 S.Ct. 1696, 131 L.Ed.2d 559 (1995); *Olin Corp. v. Consolidated Aluminum Corp.*, 5 F.3d 10, 15 (2d Cir.1993) (same, applying New York law as federal rule of decision).

law governs the interpretation of indemnification agreements involving CERCLA liabilities rest on the Supreme Court's analysis in *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), an analysis that recent Supreme Court authority has abandoned.

In *Kimbell Foods*, the Court held that federal law determines the priority of liens stemming from federal lending programs. The Court explained, however, that:

> Controversies directly affecting the operations of federal programs, although governed by federal law, do not inevitably require resort to uniform federal rules....
> Whether to adopt state law or to fashion a nationwide federal rule is a matter of judicial policy "dependent upon a variety of considerations always relevant to the nature of the specific governmental interests and to the effects upon them of applying state law."

*Id.* at 727–28, 99 S.Ct. at 1458 (citations omitted) (quoting *United States v. Standard Oil Co.*, 332 U.S. 301, 310, 67 S.Ct. 1604, 1609, 91 L.Ed. 2067 (1947)). In *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), the Court moved away from the two-tiered analysis of *Kimbell Foods* to a simple choice between federal and state law, noting the functional equivalence of applying state law of its own force and applying state law as a federal common law rule of decision:

> We refer here to the displacement of state law, although it is possible to analyze it as the displacement of federal-law reference to state law for the rule of decision. Some of our cases appear to regard the area in which a uniquely federal interest exists as

being entirely governed by federal law, with federal law deigning to "borro[w]," *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 594, 93 S.Ct. 2389, 2398, 37 L.Ed.2d 187 (1973), or "incorporat[e]" or "adopt" *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728, 729, 730, 99 S.Ct. 1448, 1458, 1459, 1459, 59 L.Ed.2d 711 (1979), state law except where a significant conflict with federal policy exists. *We see nothing to be gained by expanding the theoretical scope of the federal preemption beyond its practical effect, and so adopt the more modest terminology. If the distinction between displacement of state law and displacement of federal law's incorporation of state law ever makes a practical difference, it at least does not do so in the present case.*

487 U.S. at 507 n. 3, 108 S.Ct. at 2516 n. 3 (emphasis added).[19]

For purposes of determining federal question jurisdiction in this case, I see no difference between a suit requiring the application of state law as such and a suit involving the application of state law as a federal rule of decision. Therefore, I would hold that because Gould's presumed breach of contract action turns on an application of state law, whether of its own force or as incorporated by federal common law, Count Two does not "necessarily turn[ ] on some construction of federal law." [20]

Lastly, I note that the Supreme Court's decisions in *National Farmers, Oneida Indian Nation*, and *Illinois v. Milwaukee* are consistent with my analysis of federal question jurisdiction over Count Two of GNB's complaint. Although the Supreme Court upheld federal question jurisdiction in each

---

**19.** More recently, in *O'Melveny & Myers v. F.D.I.C.*, —— U.S. ——, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994), the Court repeated its emphasis on the question whether state or federal law governs:

> [K]nowing whether "federal law governs" in the *Kimbell Foods* sense—a sense which includes federal adoption of state-law rules, *see id.*, at 727–729, 99 S.Ct. at 1457–1459—does not much advance the ball. The issue in the present case is whether the California rule of decision is to be applied to the issue of imputation or displaced, and if it *is* applied it is of only theoretical interest whether the basis for that application is California's own sovereign

power or federal adoption of California's disposition.

*Id.* at ——, 114 S.Ct. at 2053–54 (citing *Boyle,* 487 U.S. at 507 n. 3, 108 S.Ct. at 2516 n. 3).

**20.** *Merrell Dow*, 478 U.S. at 808, 106 S.Ct. at 3232. *See Dillon v. Combs*, 895 F.2d 1175, 1176–77 (7th Cir.1990) (noting that "federal rule of decision," not state law, must govern legal obligations for federal question jurisdiction to exist), *cert. denied*, 498 U.S. 1023, 111 S.Ct. 670, 112 L.Ed.2d 663 (1991); *American Policyholders Ins. Co. v. Nyacol Prods.*, 989 F.2d 1256, 1263 (1st Cir.1993) (noting that federal question jurisdiction based on federal common law would require application of uniform federal rule).

case based on the application of federal common law, the federal common law called for was federal common law in the traditional sense—a body of uniform, federal, non-statutory law, and there was no indication that state law would provide the federal rule of decision.[21]

In sum, GNB's declaratory judgment complaint presented the district court with the following: an actual controversy between non-diverse parties over an issue of state law combined with a request for an advisory opinion on a federal question. I would hold that such a complaint does not properly invoke the jurisdiction of the federal courts.

---

**21.** *See National Farmers*, 471 U.S. at 852, 105 S.Ct. at 2452; *Oneida Nation*, 414 U.S. at 666–67, 94 S.Ct. at 777; *Illinois v. Milwaukee*, 406 U.S. at 93, 101–08, 92 S.Ct. at 1391–95. In *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 99 S.Ct. 2529, 61 L.Ed.2d 153 (1979), the Supreme Court implied, in dicta, that federal question jurisdiction could exist over a complaint requiring the application of federal common law incorporating state law as the rule of decision. There, the Court held that federal common law governs "whether changes in the course of a river affecting riparian land owned or possessed by the United States or by an Indian tribe have been avulsive or accretive," but that state law should be incorporated as the federal rule of decision. *Id.* at 673–74, 99 S.Ct. at 2540–41. The Court then noted, in response to an argument that this scheme would inadequately protect the federal interests at stake, that "the legal issues are federal and *the federal courts will have jurisdiction to hear them.*" *Id.* at 673–74, 99 S.Ct. at 2541 (emphasis added) (citing *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974)). That statement is clearly dicta, however, because federal subject matter jurisdiction in *Wilson* rested on the fact that the suit arose under a treaty. *See United States v. Wilson*, 433 F.Supp. 67, 68 (N.D. Iowa 1977), vacated, *Omaha Indian Tribe, Treaty of 1854 with the United States v. Wilson*, 575 F.2d 620 (8th Cir.1978), vacated, *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 99 S.Ct. 2529, 61 L.Ed.2d 153 (1979). Further, the Court's dicta is inconsistent with the Court's more recent emphasis on the source of the rule of decision in *Boyle* and *O'Melveny*.